NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10686


COMMONWEALTH  vs.  JAMES E. BRESCIA.



Middlesex.      January 6, 2015. - May 8, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.



Homicide.  Practice, Criminal, New trial, Witness, Capital case.
     Witness, Credibility.  Evidence, Credibility of witness.



     Indictments found and returned in the Superior Court
Department on June 26, 2006.

     The cases were tried before Wendie I. Gershengorn, J., and
a motion for a new trial, filed on April 15, 2011, was heard by
Douglas H. Wilkins, J.



     Bethany Stevens, Assistant District Attorney, for the
Commonwealth.
     Alan Jay Black for the defendant.


     LENK, J.  At the defendant's trial for murder and

conspiracy, the theory of the prosecution was that the defendant

had hired an assassin to kill the victim.  The victim was a man

with whom the defendant believed his wife was romantically

involved.  The defendant took the stand and testified on his own behalf, asserting that he had requested only that the victim be threatened or beaten, and that subsequently he had withdrawn from the arrangement altogether.  The defendant was cross-examined on the same day and on the following day.

After the jury were charged, the defendant was taken to the hospital, where it was determined that he had suffered a stroke.  Testing later revealed that the stroke had occurred on the night between the first and second days of the defendant's testimony.  The jury, who never learned of the defendant's stroke, returned guilty verdicts on both indictments.

The defendant filed a motion for a new trial.  Because the trial judge had retired, the motion was assigned to another judge, who held a four-day evidentiary hearing and issued a detailed written decision.  The judge determined that the defendant's then-undetected stroke had affected the course of his testimony in a manner that well might have damaged his credibility in the jury's eyes.  The outcome of the trial, the judge explained, had turned in large measure on the jury's assessments of credibility.  Concluding essentially that "justice may not have been done," Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), the judge ordered a new trial.  The Commonwealth appealed.

We discern no significant error of law or abuse of

discretion in the judge's decision that a new trial was warranted, and we therefore affirm.

1. Background. a. The Commonwealth's case. We describe the evidence presented by the Commonwealth in some detail. The defendant and his wife were married in 1998. In 2003, the defendant's wife filed for divorce; that action was soon withdrawn, and the couple attempted to reconcile. The defendant's wife again filed for divorce in June, 2005. At about the same time, she renewed an acquaintance with the victim, whom she had dated intermittently from 1984 to 1996. The two again began to meet in person in June or July of 2005.

The defendant learned of the rekindled connection between the victim and his wife. He and his wife fought often about this subject. The defendant's wife testified that the defendant told her, on one occasion, that "it wouldn't be good for [the victim's] health" if the victim and the defendant's wife ended up together; when the defendant's wife told him not to do something "stupid," the defendant responded, "it won't be [me] who does it."

The defendant hired a private investigator to follow his wife. In September, 2005, he also purchased records concerning the victim from an Internet search company.

The defendant heard about Scott Foxworth, allegedly the

assassin who killed the victim,[1] from a coworker, Nancy Campbell. Campbell previously had dated Foxworth. The defendant learned, among other things, that Foxworth had been incarcerated for murder, and that he once had offered to have Campbell's husband "beaten up." The defendant asked Campbell to contact Foxworth, saying that he "wanted somebody taken care of." Instead, Campbell gave the defendant Foxworth's telephone numbers.

The defendant contacted Foxworth in October, 2005. The content of the arrangement made between Foxworth and the defendant was the key point of dispute at trial. According to Campbell's testimony, the defendant spoke, at first, of wanting to have the victim "beaten up"; but later, in approximately December, 2005, the defendant said that "a beating wasn't enough," and that if the victim were to die, the crime could not be traced back to the defendant.[2]

The defendant telephoned Foxworth sixty-four times over the months following their initial contact in October, 2005. He made these calls from pay telephones, using coins and prepaid

---

[1] Scott Foxworth was subsequently convicted of murder in the first degree in a separate trial. His appeal is pending in this court.

[2] The credibility of Nancy Campbell's testimony was weakened on cross-examination, primarily in view of the fact that she had not told police that the defendant wanted the victim killed until the fourth time she was interviewed. See part 3, infra.

cards he purchased for this purpose.  On October 14, the defendant and his mother cashed a check in the amount of $4,459; the next day, Foxworth made a cash deposit of $1,000.

Sometime in September, 2005, the defendant had left the home he had shared with his wife.  From Christmas Eve of that year to New Year's Day, however, the defendant stayed at that house with his wife and their children.  The defendant and his wife were sexually intimate during this period.  His wife told him, however, that she still intended to move forward with a divorce.  Soon thereafter, the defendant wrote to his wife that their time together over the holidays had intensified his confusion and his emotions for her.  The defendant also sent a series of electronic mail messages in the same vein to his wife's sister.

On January 13, 2006, the victim was found dead in his automobile, parked in a parking garage in Newton next door to the building where he worked.  The cause of death was a gunshot wound to the head.  The victim's wallet, which contained credit cards and $541 in cash, was recovered from the scene.

A red vehicle was seen at the victim's workplace on the morning of the shooting.  A witness thought that the vehicle might have been a Ford Taurus.  None of the individuals who worked in that building drove a vehicle of that description. Foxworth owned a red Taurus, and sometime in 2006, his daughter

saw him in that vehicle with a gun.

On January 15, 2006, the defendant asked Charles Merkle, an acquaintance of his, for $2,500 that Merkle was holding for the defendant in an envelope.[3] The defendant said that he needed the money to pay a lawyer. Merkle accompanied the defendant to a fast food restaurant in Andover. The defendant entered the restaurant with the envelope containing the money, and left without it.

b. The defense. The defendant testified on his own behalf, relating the following version of events. The defendant learned that his wife had reconnected with the victim. He knew that the victim had a history of drug abuse and drug offenses, felt that the victim was not a good role model, and "didn't want [his] children to be around any[body] like that." When the defendant first spoke to Foxworth, he mentioned that it "wouldn't bother [him]" to see the victim "get beat up or something."

Later on, according to the defendant, he asked Foxworth to "approach[]" the victim and to "engage." Foxworth asked to be paid $2,000, and the defendant "laughed and . . . said[,] 2,000 dollars just to go talk to somebody?" Foxworth suggested that

---

[3] The defendant had given Charles Merkle an envelope containing $5,000 around Thanksgiving, and had taken back half of that money sometime near Christmas.

the defendant pay him $1,000 in advance and another $1,000 if "it stops."  In October, 2005, the defendant agreed, and he paid Foxworth $1,000 in cash.  The defendant's understanding was that Foxworth would "threaten" the victim, and perhaps "beat him if it came to that"; he never asked Foxworth to kill the victim. The defendant continued to speak to Foxworth on the telephone, usually about Foxworth's desire to date Campbell again and his hope that the defendant would intercede with Campbell on his behalf.

By early December, 2005, the defendant testified, it appeared to him that Foxworth was not "interested in doing anything."  The defendant asked Foxworth to return his money and to "forget this whole thing."  The defendant reiterated this request several times in late December, 2005, and early January, 2006, telling Foxworth also that "things were going well with the family and . . . it didn't appear that [the defendant] needed to do anything like that anymore."

After he found out that the victim had been killed, the defendant called Foxworth, who said, "[W]ell, at least your problem's taken care of now."  The defendant was "flabbergasted."  Foxworth then asked the defendant for the "other thousand dollars," and told the defendant that if he didn't pay, "the same would end up happening to [him]."  The defendant obtained the envelope containing $2,500 from Merkle,

paid Foxworth $1,000, and kept the remaining $1,500.

c. Conclusion of the trial. The direct examination of the defendant took place on June 19, 2008, a Thursday. The defendant was cross-examined on that afternoon and on the following day. The jury were charged on Monday, June 23, 2008. The next morning, the judge and the attorneys were informed that the defendant had suffered a stroke and had been taken to the hospital. The jury began their deliberations that day without entering the court room and, therefore, without learning that anything out of the ordinary had occurred.

The defendant's attorney visited the hospital, where he spoke with the defendant and with the defendant's doctor. Upon returning to the court house, defense counsel reported that the defendant had communicated with him "without obvious difficulty." The defendant told his attorney that he waived his right to be present for the remainder of the trial. Defense counsel's assessment was that this waiver "was made knowingly and intelligently." Later that day, the jury found the defendant guilty of both murder in the first degree and conspiracy.

d. Postconviction proceedings. The defendant moved for a new trial, arguing that (a) a crucial stage of the trial had been conducted while he was incompetent; (b) the judge did not ensure that the defendant validly waived his right to be

present; and (c) the defendant was deprived of his right to the effective assistance of counsel, because his attorney failed to seek an examination of the defendant's competency, waived the defendant's right to be present for the end of the trial, and did not move for a mistrial after learning of the defendant's stroke. The defendant also filed his direct appeal, which was stayed pending resolution of the motion for a new trial.

The motion judge held a four-day evidentiary hearing. The judge heard testimony from the defendant, his trial attorney, a court officer, the court reporter who had transcribed the trial, a jailhouse nurse, two medical experts called by the defendant (a neurologist and a forensic psychiatrist), and a neurologist called by the Commonwealth. The trial had been videotaped by a network television station, and the judge thus was able to consult high-quality video recordings of the defendant's two days of testimony (as was this court).[4]

The motion judge made the following findings of fact, which are not in dispute.

Beginning in the early morning hours of June 20, 2008, the defendant suffered at least one stroke, "ischemic in nature, caused by an embolus that blocked blood flow to areas of the

---

[4] The motion judge noted that the video recording was made "possible only because the Commonwealth allows cameras in the courtroom."

brain."  The stroke was not diagnosed when the defendant's symptoms first arose, but ultimately it was confirmed by a magnetic resonance imaging scan and by expert analysis.

The first symptom of the defendant's stroke was a severe headache, which interfered with his sleep on the night following his first day on the stand.  The defendant's headache continued during the ensuing day.  He twice complained to a court officer, and was told both times that he could not be given aspirin.[5]

On the defendant's second day of testimony, the court reporter noticed that the defendant was confusing syntax, pronouns, names, and the like.  During a break, the court reporter asked the defendant's attorney, "What's up with your guy?"  Defense counsel responded that the defendant was acting as usual.

The motion judge found that, in hindsight, the court reporter had been correct.  As reflected in the transcripts and the video recordings, the defendant's "ability to testify was reduced" on his second day of testimony, as compared both to the previous day and to the defendant's "usual capabilities."  The defendant sometimes appeared "uncomprehending or hesitant."  He had "difficulty understanding the questions being asked of him,"

---

[5] The judge wrote that a conversation between the defendant and his attorney, which was captured inadvertently on the video recording of the trial, was not material to his decision.

and "[a]fter understanding the questions, the defendant . . . had more difficulty than usual in finding and saying the words he wanted to use."  The defendant did not, however, present incriminating testimony or testimony that was inconsistent with his theory of defense; his deficits "went to the manner and timing of his testimony . . . not to the substance."  On the basis of the expert testimony presented, the judge found that these deficits had been caused by the defendant's stroke.

Proceeding from these findings of fact, the motion judge rejected the defendant's arguments for a new trial based on alleged constitutional errors.  The judge determined that (a) the defendant was competent to stand trial at all relevant times; (b) the trial judge conducted an appropriate inquiry into the defendant's competency, and her decisions on the basis of that inquiry involved no error or abuse of discretion; (c) the defendant executed a knowing and intelligent waiver of his right to be present at the final stages of his trial; and (d) the assistance provided by the defendant's trial counsel was not unconstitutionally ineffective.

Nevertheless, the judge concluded that a new trial was warranted "under the test of Mass. R. Crim. P. 30 (b) ('justice may not have been done')."  The judge explained that "[t]he jury could have viewed the defendant's non-responsiveness, claimed lack of memory and requests for repetition of the question [on

his second day of testimony] as disingenuous or intentionally evasive and therefore as undermining his credibility."  In closing argument, "[t]he Commonwealth . . . seized upon those difficulties and the defendant's demeanor as proof of mendacity."  And the trial judge instructed the jury, consistent with the model jury instructions, that a witness's demeanor on the stand is a factor relevant to assessing his or her credibility.  Given that the defense had "turned upon whether the defendant's testimony created a reasonable doubt for the jury," the judge concluded that the unusual circumstances gave rise to a "basic unfairness or potential for injustice," requiring a new trial.  The Commonwealth timely appealed.

2.  Applicable standards.  It is well established that, "[i]n reviewing the denial or grant of a new trial motion, we 'examine the motion judge's conclusion only to determine whether there has been a significant error of law or other abuse of discretion.'"  Commonwealth v. Wright, 469 Mass. 447, 461 (2014), quoting Commonwealth v. Weichell, 446 Mass. 785, 799 (2006).[6]  A judge's findings of fact made after an evidentiary

---

[6] "When the defendant has prevailed on a motion for a new trial after a conviction of murder in the first degree . . . the [G. L. c. 278, § 33E,] standard [requiring review for a substantial likelihood of a miscarriage of justice] does not apply, for, if we affirm the allowance of the motion and the defendant is convicted at retrial, he receives § 33E review on appeal."  Commonwealth v. Hill, 432 Mass. 704, 710 n.14 (2000),

hearing "will be accepted if supported by the record." Commonwealth v. Walker, 443 Mass. 213, 224 (2005), citing Commonwealth v. Bernier, 359 Mass. 13, 16 (1971). If the motion judge did not preside at the trial, we "regard ourselves in as good a position as the motion judge to assess the trial record." Commonwealth v. Wright, supra, quoting Commonwealth v. Weichell, supra.

The parties disagree about the standard that the judge should have applied in reviewing the motion for a new trial. As noted, the judge did not find that the defendant's trial had been infected by error; the defendant does not challenge this determination. The Commonwealth argues that, under these circumstances, a new trial would be warranted only upon a showing of a "substantial risk of a miscarriage of justice." Alternatively, the Commonwealth suggests that the defendant should be held to the standard applicable when a new trial is sought on the basis of newly discovered evidence. The defendant, on the other hand, contends that the judge was permitted "to consider the essentially case-specific issue of whether there has been a miscarriage of justice on a highly discretionary standard."

---

citing Commonwealth v. Martin, 427 Mass. 816, 817-818 & n.2 (1998).

For the reasons we describe, our view is essentially that taken by the motion judge and urged by the defendant.

The point of departure for the resolution of a motion for a new trial is Rule 30 (b) of the Massachusetts Rules of Criminal Procedure, which provides that, upon a motion in writing, a judge "may grant a new trial at any time if it appears that justice may not have been done." The fundamental principle established by Mass. R. Crim. P. 30 (b) is that, if it appears that justice may not have been done, the valuable finality of judicial proceedings must yield to our system's reluctance to countenance significant individual injustices.[7]

Our decisions have crafted a latticework of more specific standards designed to guide judges' determinations, in various types of situations, as to whether a new trial should be ordered. A new trial is required if prejudicial constitutional error occurred at trial. See Commonwealth v. Martin, 467 Mass.

---

[7] The authority of a judge deciding a motion under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), is substantially similar to the authority on a motion under Mass. R. Crim. P. 25 (b) (2), as amended, 420 Mass. 1502 (1995). See Commonwealth v. Pring-Wilson, 448 Mass. 718, 732 n.14 (2007), citing Commonwealth v. Doucette, 408 Mass. 454, 455-456 (1990), and Commonwealth v. Pope, 392 Mass. 493, 497 (1984) ("A judge has similar broad discretion to grant a new trial in the interests of justice under both rules"); Commonwealth v. Gilbert, 447 Mass. 161, 165-169 (2006) (motions brought under either rule may result either in new trial or in reduction of conviction to lesser charged offense).

291, 316 (2014); Commonwealth v. Sullivan, 385 Mass. 497, 503 (1982). If a motion for a new trial rests on an unpreserved claim of nonconstitutional error, a new trial should be granted only if the defendant demonstrates a "substantial risk of a miscarriage of justice," Commonwealth v. Childs, 445 Mass. 529, 530 (2005), namely, "a serious doubt whether the result of the trial might have been different had the error not been made." Commonwealth v. Randolph, 438 Mass. 290, 297 (2002), quoting Commonwealth v. Azar, 435 Mass. 675, 687 (2002).[8] Newly discovered evidence warrants a new trial if that evidence "casts real doubt on the justice of the conviction," in the sense that the evidence "would probably have been a real factor in the jury's deliberations." See Commonwealth v. Cowels, 470 Mass. 607, 616-617 (2015), quoting Commonwealth v. Grace, 397 Mass. 303, 305-306 (1986).[9]

---

[8] The Appeals Court has said, in dicta, that "[w]hen the basis alleged in the new trial motion is not prejudicial constitutional error, but some other manifest injustice, then the determination that justice may not have been done equates with a substantial risk of a miscarriage of justice." Commonwealth v. Wheeler, 52 Mass. App. Ct. 631, 636 n.9 (2001), citing Commonwealth v. LeFave, 430 Mass. 169, 171-174 (1999). But in the decision on which this statement relies, our reason for applying the "substantial risk of a miscarriage of justice" standard was that the argument presented had been waived by the defendant in earlier proceedings. See Commonwealth v. LeFave, supra at 173-174.

[9] For at least two reasons, we do not think that the standard applicable to motions for a new trial based on newly

These specific standards, and others,[10] have not eclipsed
the broader principle that a new trial may be ordered if "it
appears that justice may not have been done."  This point is
illustrated by our decision in Commonwealth v. Pring-Wilson, 448
Mass. 718 (2007) (Pring-Wilson).  The trial judge there excluded

discovered evidence would be appropriate here.  First, the basic
facts concerning the defendant's stroke were known to the judge
and the attorneys before the jury had returned a verdict.  It is
therefore doubtful that the defendant could "establish that the
evidence was unknown . . . and not reasonably discoverable at
the time of trial."  Commonwealth v. Cowels, 470 Mass. 607, 616
(2015), quoting Commonwealth v. Shuman, 445 Mass. 268, 271
(2005).  Second, the information as to the stroke that the
defendant suffered during the course of trial does not itself
directly concern the crime of which he stood accused at trial.
In that sense, it is quite unlike the type of evidence that
ordinarily is examined to see if it might have been "a real
factor in the jury's deliberations."  Commonwealth v. Cowels,
supra at 617, quoting Commonwealth v. Grace, 397 Mass. 303, 306
(1986).  That being said, we do not consider whether, in the
singular circumstances of this case, a new trial would have been
warranted had the jury been informed of the stroke and its
effects on the defendant before they began deliberations.

[10] See, e.g., Commonwealth v. Murray, 461 Mass. 10, 20-21
(2011) (where Commonwealth withheld exculpatory evidence not
specifically requested, applicable standard is "the same
standard used to assess the impact of newly discovered
evidence"); Commonwealth v. Daniels, 445 Mass. 392, 404 (2005),
quoting Commonwealth v. Tucceri, 412 Mass. 401, 412 (1992)
(where Commonwealth withheld exculpatory evidence that was
specifically requested, defendant seeking new trial "need only
demonstrate that a substantial basis exists for claiming
prejudice from the nondisclosure"); Commonwealth v. Comita, 441
Mass. 86, 90 (2004), quoting Commonwealth v. Saferian, 366 Mass.
89, 96-97 (1974) (motion for new trial based on ineffective
assistance of counsel must establish "that the behavior of
counsel fell below that of an ordinary, fallible lawyer and that
such failing 'likely deprived the defendant of an otherwise
available, substantial ground of defence'").

probative evidence that the victims had histories of violence, reasoning that the defendant knew nothing of those histories. See id. at 719.  This ruling was correct, since we had not yet held, in Commonwealth v. Adjutant, 443 Mass. 649, 664 (2005), that judges would thereafter have discretion to admit such evidence.  The judge in Pring-Wilson nevertheless ordered a new trial after we decided Commonwealth v. Adjutant, supra, stating that, in light of the concerns we recognized there, "the integrity of the defendant's trial was compromised."  Pring-Wilson, supra at 720.  We affirmed the grant of a new trial; although no error had been made and the defendant presented no newly discovered evidence of his innocence, we could not "say that the judge's conclusion that 'fairness require[d]' granting the defendant a new trial was an abuse of her broad discretion to see that justice is done."  Id. at 737 (alteration in original).

Some guidance as to how judges should decide if "justice may not have been done," in the absence of error or new evidence, is provided by our older decision Commonwealth v. Lombardi, 378 Mass. 612 (1979) (Lombardi).  The defendant there suffered from permanent amnesia, which destroyed his ability to remember the events of the crime he was charged with committing. We held that amnesia does not itself render a defendant incompetent to stand trial; but that "[t]he appropriate

test . . . is whether a defendant can receive, or has received, a fair trial." Id. at 615. We stressed that "[s]uch a question of fundamental fairness can only be determined on a case by case basis." Id. at 616. We also provided a non-exhaustive list of factors to be considered, including

> "the nature of the crime, the extent to which the prosecution makes a full disclosure of its case . . . , the degree to which the evidence establishes the defendant's guilt, the likelihood that . . . [a] defense could be established but for [the defendant's condition], and the extent and effect of [the condition]."

Id. A judge weighing whether a new trial is warranted in light of these and similar factors must keep in mind that "[a] defendant is entitled to a fair trial but not a perfect one, 'for there are no perfect trials.'" Commonwealth v. Graves, 363 Mass. 863, 872-873 (1973), quoting Brown v. United States, 411 U.S. 223, 231-232 (1973). The judge also must focus on the probable effect of the circumstances on the jury's decision-making, and not on his or her own "personal assessment of the trial record," see Commonwealth v. Tucceri, 412 Mass. 401, 411 (1992), in order to "preserve[] . . . the defendant's right to the judgment of his peers." Id.

In sum, extraordinary fact patterns can frustrate even meticulous efforts to do justice. Situations that are not encompassed by the more specific standards delineated in our case law nevertheless may require judges to exercise their

"broad discretion to see that justice is done."  Pring-Wilson,
448 Mass. at 737.  In such cases, judges must determine whether
the defendant "can receive, or has received, a fair trial."
Lombardi, 378 Mass. at 615.  This determination must be made "on
a case by case basis," taking into account a number of specific
factors.  See id. at 616.[11]

---

[11] Judges weighing whether justice may not have been done in
those rare cases not governed by more specific standards may, in
some instances, find direction in our body of decisions
reviewing capital convictions pursuant to G. L. c. 278, § 33E.
We have noted certain points of similarity between our authority
under § 33E and that of judges deciding motions for
postconviction relief.  See Commonwealth v. Woodward, 427 Mass.
659, 668-669 (1998) (postconviction judge may, and we must,
consider all of the evidence); Commonwealth v. Carter, 423 Mass.
506, 513 (1996) (both § 33E and Mass. R. Crim. P. 25 [b] [2]
provide variety of remedies including reduction of conviction
to lesser charged offense).  See also Commonwealth v. Rolon, 438
Mass. 808, 820 (2003), quoting Commonwealth v. Gaulden, 383
Mass. 543, 555 (1981) (decision whether to reduce verdict
"should be guided by the same considerations" in both contexts);
note 7, supra.  Importantly, like judges deciding if "justice
may not have been done," we grant relief under § 33E not only
because of errors at trial, but also "for any . . . reason that
justice may require."  See Commonwealth v. Colleran, 452 Mass.
417, 431 (2008).  In § 33E appeals, we review every issue for --
at a minimum -- a "substantial likelihood of a miscarriage of
justice."  "Under that standard, 'a new trial is called for
unless we are substantially confident that, if the error had not
been made, the jury verdict would have been the same.'"
Commonwealth v. Figueroa, 468 Mass. 204, 229 (2014), quoting
Commonwealth v. Ruddock, 428 Mass. 288, 292 n.3 (1998).  We
never have held that postconviction judges should apply the
"substantial likelihood of a miscarriage of justice" standard to
determine whether a new trial (or another remedy) is warranted.
See, e.g., Commonwealth v. Marrero, 459 Mass. 235, 244 (2011),
quoting Commonwealth v. Williams, 453 Mass. 203, 204-205 (2009)
(ineffective assistance of counsel claims are subject, on § 33E
review, to test "more favorable to a defendant" than that of

3. <u>Application</u>.  In view of the foregoing principles, we
conclude that the motion judge made no significant error of law
and that he did not abuse his discretion.  See <u>Commonwealth</u> v.
<u>Wright</u>, 469 Mass. 447, 461 (2014), quoting <u>Commonwealth</u> v.
<u>Weichell</u>, 446 Mass. 785, 799 (2006).

The motion judge applied essentially the framework we have
just described.  He stressed that he was relying on the rule
that a new trial may be ordered if "justice may not have been
done."  "Ultimately," the judge wrote, "the [m]otion raises the
issue whether justice may not have been done, given the nearly
unique facts of this case."  The judge stated that, in
addressing this issue, he drew "helpful guidance" from our
decision in <u>Lombardi</u>, 378 Mass. at 616, in which we asked
"whether a trial of the defendant would be unfair in a due
process sense."  The judge did not assume that the defendant is
entitled to a perfect trial, but rather to one that is
"fundamental[ly] fair[]."  He noted also that "[i]t is not for a
judge to say whether a reasonable doubt exists as to the fact or
degree of [the defendant's] guilt after reweighing the evidence,

_____

<u>Commonwealth</u> v. <u>Saferian</u>, <u>supra</u> at 96, applied by postconviction
judges).  Nevertheless, where no more specific standard applies,
judges' decisions as to whether justice may not have been done
may benefit from consideration of whether it is possible to be
"substantially confident" that "the jury verdict would have been
the same" if not for a problem that occurred at trial, and from
our cases answering that question in a variety of situations.

credibility and arguments in light of what we now know." These statements correctly describe the applicable law.

The decision that the judge was required to make was a difficult one. The "nature of the crime" with which the defendant was charged was heinous. See Lombardi, supra. There was no suggestion that the prosecution had provided imperfect "disclosure of its case," or that it had engaged in any misconduct whatsoever. See id. Moreover, as the judge recognized, "the Commonwealth's case was strong, particularly regarding the defendant's motive and contacts with Foxworth."

The evidence about the nature of the defendant's arrangement with Foxworth was somewhat weaker, however. The Commonwealth's most direct evidence on this point was provided by Campbell, the defendant's coworker, who testified that the defendant eventually told her that "a beating wasn't enough," and that (in essence) it would be better if the victim were to die. Campbell was testifying pursuant to a grant of immunity, which might have led the jury to question her credibility. And as cross-examination revealed, she at first told police that the defendant had never said to her that he wanted the victim killed. In fact, Campbell did not inform police that the defendant had wanted Foxworth to kill the victim in any of her first three interviews with police, or in a twenty-two-page document that she wrote, after her third interview, detailing

her discussions concerning Foxworth with the defendant.

The remainder of the evidence presented by the Commonwealth arguably was consistent with the defendant's own account.  The jury could have accepted the defendant's explanation that his frequent conversations with Foxworth were not about a plot to kill the victim, but rather often concerned Foxworth's wishes that the defendant help him reconnect with Campbell, or the defendant's inquiries as to when Foxworth was planning to take action.  Similarly, the jury could have believed that, in late December, 2005, and early January, 2006, the defendant had withdrawn from the agreement, as he claimed, and was seeking a refund of the money he had paid Foxworth.  Moreover, they could have "believe[d] all, some, or none of the testimony of any witness," including the defendant.  See Commonwealth v. Ortiz, 470 Mass. 163, 167 (2014), quoting Commonwealth v. Gomes, 459 Mass. 194, 203 (2011).

Under these circumstances, the likelihood that "[a] defense could be established" by the defendant, see Lombardi, 378 Mass. at 616, turned on whether the jury would believe the defendant's testimony that he had not asked Foxworth to kill the victim.  Various aspects of a witness's testimony on the stand, including his demeanor, whether his answers are consistent with prior statements, and whether he appears to be avoiding the questions asked, can affect the jury's determinations of credibility.  See

Commonwealth v. Louraine, 390 Mass. 28, 37-38 (1983). We agree with the motion judge's determination that, in essence, the "extent and effect" of the defendant's stroke materially affected his chances of mounting a successful defense. See Lombardi, supra.

The defendant's difficulty understanding questions and communicating answers on the second day of his testimony are apparent from the video recording and transcript of that day's proceedings. A few illustrations among many are reproduced in the margin.[12] The written transcript attaches the annotation

---

[12] The cross-examination of the defendant on that day began as follows:

Q.: "I'd like to talk to you about your relationship with Scott Foxworth . . . . You met him prior to his going away to prison in August of 2002, isn't that correct?"

A.: "Can you ask that again please, I'm sorry."

Q.: "You first met Scott Foxworth prior to August of 2002 when he went to prison for three years?"

A.: "I don't understand what you're asking me."

Q.: "You met Scott Foxworth prior to August of 2002?"

A.: "2002?  No."

    ". . .

Q.: "So, the answer to [the] question, did you meet Scott Foxworth prior to him going away to prison in August of 2002, is, yes, right?"

A.: "Yeah, I'm sorry, Adrienne, I've got a headache."

"[sic]" to the defendant's testimony seventeen times; no such annotations appear in the transcription of his testimony on the previous day, either on direct examination or on cross-examination.  Fifteen times, the defendant asked that a question be repeated, or expressed confusion about its meaning; this had happened once on the previous day.  Almost three dozen times, the defendant responded to questions by saying that he did not know the answer; this, too, had happened once on the previous day.  In other instances, the defendant appeared to answer an entirely different question from the one that had just been posed.  Many of these exchanges could have suggested deliberate evasiveness to the jury.[13]

---

On the crucial question of the instructions that he had given to Foxworth, the defendant's testimony was (on his second day of testimony) incoherent:  "I didn't say I wanted him to get beat . . . . I didn't specifically tell Scott that I wanted him to beat him.  I eventually discussed saying that I wouldn't mind seeing him get beat but that wasn't until afterward [sic] I had talked to him and told him that I just wanted him to go talk to him."

Later, asked about his finances, the defendant said:  "I paid -- I was paying the mortgage.  I was paying some expenses to pay expenses.  I was paying the house in Waltham.  I was giving my money some money."

[13] Again, a small sample of exchanges is illustrative. First:

Q.:  "[Y]ou knew that when the divorce was final that [the victim] would be able to have access to your children, correct?"

A.:  "I don't understand."

". . .

Q.:  "Did you testify yesterday that . . . you contacted Scott Foxworth because you didn't want Ed around your children until the divorce was final?"

A.:  "My final wasn't until much, much, much later."

Q.:  "Do you understand the question that I am asking, Mr. Brescia?"

A.:  "I guess -- I guess I don't."

And subsequently:

Q.:  "When did you, uh, give [Foxworth] the green light?"

A.:  "Probably prior to [when Foxworth was in the hospital].  I remember he -- his surgically got delayed (sic)."

Q.:  "So, was it before or after [an argument between the defendant and his wife] at the Framingham Union Hospital . . . ?"

A.:  "Was what?"

Q.:  "When you decided to give Scott Foxworth the green light?"

A.:  "I don't know if it was before and (sic) after; I don't recall."

And finally:

Q.:  "You said that . . . it had to do with the fact that [the victim] was seeing your kids during the pendency of the divorce, correct?"

A.:  "I don't know."

The manner in which the prosecutor framed and delivered her questions on cross-examination suggested time and again that, in the prosecutor's view, the defendant was not answering her questions responsively.  On one such occasion, when the defendant failed to provide an appropriate answer, the prosecutor said, "Wait.  Did you testify here yesterday?  Do you remember that?"

The inference that the pattern of the defendant's testimony indicated prevarication was pressed more explicitly in the prosecutor's closing argument, delivered before the defendant's stroke was discovered.  The prosecutor said:

> "Let's look at the defendant's testimony.  Make no mistake about it, he wasn't confused by the questions that were being asked him.  He couldn't keep his story straight from one minute to the next.  It's hard to keep track of what you're saying when you're just making it up as you go along . . . . He certainly was able to answer the questions his attorney asked him.  Some of the questions I asked him, answers didn't come easy.  To some of them, they didn't come at all."

---

Q.:   "Well, I'm asking you about what you thought and what you felt and what you believed; you don't know what you thought, felt, or believed?"

A.:   "What question?"

      ". . .

Q.:   "[I]s it your testimony that your issues with [the victim] were over his access to your children during the divorce because he wasn't a suitable role model?"

A.:   "What day? I don't know."

The prosecutor's argument also drew on the defendant's stated inability to recall important details:

> "[The defendant] didn't remember when he approached Foxworth. He didn't remember where he approached Foxworth. He didn't remember when he decided and he didn't remember when he paid the one half up front . . . . Is that believable?"

The trial judge's instructions would have permitted the jury to draw the inferences invited by the prosecutor. "In determining the credibility of a witness," the judge said, the jury could consider, among other things, "the demeanor of the witness as the witness spoke to you from the witness stand," as well as "the accuracy of the witness'[s] recollection and the degree of intelligence shown by the witness."

Again, the defendant's request for a new trial posed a close question. The Commonwealth had painstakingly presented a powerful case. The damage wrought by the defendant's stroke was concentrated primarily in the manner and style of his testimony, rather than its substance. Still, we do not think that the motion judge's conclusion that a new trial is warranted was an abuse of discretion. See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). The fairness of the defendant's trial was hampered by an extraordinary confluence of factors: the second day of the defendant's testimony addressed issues that lay at the heart of the case against him. In the words of the motion

judge, the symptoms of the defendant's stroke were severe enough on that day to injure his "apparent credibility for medical reasons unrelated to his actual credibility." Yet those symptoms were not of a kind that could have prompted the judge or the attorneys to postpone the remainder of the defendant's testimony. The defendant's symptoms also would not have communicated to the jury that his failure to answer questions cogently was the result of a physical impairment. The fact that the defendant had been healthy on his first day of testimony created what the jury could have seen as a suspicious contrast between the defendant's relative ease in answering his own attorney's questions and his greater difficulty in answering those posed by the prosecutor. Finally, it is not likely that these weaknesses in the defendant's testimony went unnoticed by the jury, given that they were highlighted by the prosecutor both during cross-examination and in closing argument.

In the highly unusual circumstances presented, there was no abuse of discretion in the judge's decision that "it appears that justice may not have been done."

Order allowing motion for
a new trial affirmed.
