NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12115


COMMONWEALTH  vs.  VICTOR ROSARIO.



Middlesex.     November 8, 2016. - May 11, 2017.

Present:  Gants, C.J., Botsford, Hines, Gaziano, Lowy, & Budd,
JJ.[1]



Burning a Dwelling House.  Homicide.  Fire.  Constitutional Law,
    Admissions and confessions, Voluntariness of statement.
    Evidence, Admissions and confessions, Voluntariness of
    statement.  Practice, Criminal, New trial, Admissions and
    confessions, Voluntariness of statement.




    Indictments found and returned in the Superior Court
Department on June 30, 1982.

    A motion for a new trial, filed on October 19, 2012, was
heard by Kathe M. Tuttman, J.

    The Supreme Judicial Court granted an application for
direct appellate review.


    Jessica Langsam, Assistant District Attorney (Thomas F.
O'Reilly, Assistant District Attorney, also present) for the
Commonwealth.
    Lisa M. Kavanaugh, Committee for Public Counsel Services
(Andrea Petersen also present) for the defendant.

_____

    [1] Justice Botsford participated in the deliberation on this
case prior to her retirement.

M. Chris Fabricant, Karen Newirth, James C. Dugan, Vincent P. Iannece, Lara S. Kasten, & Kathryn J. Ranieri, of New York, Stephanie Roberts Hartung, & Sharon L. Beckman, for New England Innocence Project and others, amici curiae, submitted a brief.

BUDD, J.  The defendant, Victor Rosario, was convicted in 1983 of one count of arson in a dwelling house and eight counts of murder in the second degree; all the charges stem from a fire that occurred in 1982.  In 2012, the defendant filed the motion for a new trial at issue here, arguing principally that newly discovered evidence regarding fire science and the conditions under which he confessed to the crime warranted a new trial. Following an evidentiary hearing, a Superior Court judge who was not the trial judge allowed the motion, ruling that the defendant had presented newly discovered evidence, which cast real doubt on the justice of his convictions.  The Commonwealth appealed.  We allowed the defendant's application for direct appellate review, and we affirm the order allowing the defendant's motion for a new trial, but on different grounds.[2]

Background. 1. Evidence presented at trial. We summarize relevant evidence introduced at trial.  The fire started on the first floor of a multi-unit apartment building in Lowell, and was accompanied by the sound of breaking glass.  The first

---

[2] We acknowledge the amicus brief of the New England Innocence Project, the Innocence Project, Inc., and the Boston College Innocence Program.

telephone call to 911 was placed shortly after 1 A.M. on March 5, 1982. Police officers arrived, minutes later, to find the building "fully engulfed in flames." It took firefighters approximately one hour to get the fire under control. They recovered eight bodies from the building, all victims of the fire.

Because of the rapid escalation of the fire and the associated deaths, the arson unit was called to the scene. Investigators found that the heaviest burning and charring was concentrated in the front, right, and left sides of the exterior and first-floor interior of the building. Based on the burn patterns in the front hallway, living room, and kitchen, investigators believed that the fire had been concentrated along the floor and baseboards. Although no wicks or flammable liquids were detected in the apartment, the investigators believed that the burn marks were consistent with flammable liquids with points of origin being the front hall and kitchen. Thus, they concluded that the fire was not accidental and could have been started by multiple incendiary devices, such as "Molotov cocktails."[3]

---

[3] A "Molotov cocktail" is a breakable container with a wick filled with a flammable liquid. It is used by lighting the wick and throwing the container against a hard surface so that it breaks, igniting the fluid inside the bottle, and starting a fire.

There were several witnesses to the fire. One witness had seen three men standing in front of the building minutes before the fire; he said that he heard the sound of breaking glass and then saw a man with his arm raised.[4] A woman who lived across the street stated that the defendant used drugs at her apartment that night and that she saw him breaking windows after she learned of the fire. Red Cross workers treated the defendant for a cut on his hand at the scene and sent him to the hospital.

This evidence led investigators to the defendant, who was interrogated by Lowell police officers at the fire department headquarters during the night of March 6 and into March 7. The defendant, whose first language was Spanish, was provided with a civilian interpreter.[5] Although the defendant appeared calm and responsive when he arrived at approximately 11 P.M., soon after

---

[4] When this witness was asked to make an identification at the police station, he described one of the men as Puerto Rican and approximately five feet, five or six inches tall with a thin mustache, but he did not pick the defendant out of a photographic array. After the defendant's photograph appeared in the newspaper the witness told police that he recognized the defendant as one of the three men who had been on the street before the fire.

[5] The interpreter, who was an active leader in the Lowell Hispanic community at the time, had previously assisted the Lowell police as an interpreter in at least one other interrogation in relation to another suspicious fire that had occurred in the same building. Some months after the interrogation, before the defendant's trial in early 1983, the interpreter became a deputy sheriff for Middlesex County at the Billerica house of correction.

that he indicated that he was beginning to hear voices, and his mental state deteriorated over the course of the night. A few hours into the interrogation, after the defendant had made two statements about the fire, one of the officers told the defendant that they had "certain information" and wanted "to know if he was part of it." The defendant broke down, sobbing and praying on the floor. The breakdown lasted ten to twenty minutes, but the defendant later appeared to recover.

The questioning resulted in three statements prepared by the police interrogators and signed by the defendant. In the first, signed at approximately 12:15 A.M., the defendant admitted to being at the scene of the fire and stated he broke a window to help rescue children from the building. Hours later, he signed a second statement, admitting to being at the scene as a "look out" for two other men, one of whom threw a Molotov cocktail through a window in the building. Finally, toward the end of the questioning, the defendant signed a final statement indicating that he and the other two men threw Molotov cocktails into the building, starting the fire. The statement also said that before they had left for a bar that evening, he watched the two other men make three Molotov cocktails in the basement of

his house;[6] they planned to start the fire because one of the men "wanted to get [one of the victims] over drugs." At approximately 6:30 A.M., the defendant was arrested after signing the final statement.

Following his booking, the defendant descended into total incoherence. He repeatedly said that he was "the son of God," believed that the back of his head had been cut off, and did not recognize his girl friend when she came to visit him. He eventually was transferred to the house of correction in Billerica for a psychiatric examination. State psychiatrists there and at Bridgewater State Hospital (hospital) diagnosed the defendant as psychotic. He was treated at the hospital and eventually recovered. His symptoms never recurred, and the defendant was deemed competent to stand trial.

The defense theory of the case at trial was that the defendant was at the scene of the fire because he and his friends were walking home from a bar and stopped by a house close to the fire to purchase drugs. The defendant, who testified, told the jury that he hurt his hand when he broke a window in his attempt to rescue children from the flames. Both

---

[6] When the police searched the common basement of the defendant's apartment building, they found a gasoline can and a paint can with a beer bottle and other trash inside. At an apartment belonging to one of the other men, the police found a can of "Red Devil" paint remover, which had been purchased days before the fire.

in a motion to suppress and at trial, the defense relied on the diagnosis of psychosis to argue that the defendant's statements during the interrogation were involuntary. The defendant testified that he did not remember making any of the statements attributed to him and that he had never heard of a Molotov cocktail before the interrogation. As the voluntariness of his confession was at issue throughout the trial, the trial judge instructed the jury on the humane practice rule.[7] During their deliberations, the jury requested, but were not provided, transcripts of the doctors' testimony, and the doctors' reports were not admitted into evidence. The jury convicted the defendant of arson and eight counts of murder in the second degree.

2. The motion for new trial. In 2012, the defendant filed his motion for a new trial, citing newly discovered evidence. The motion judge conducted an evidentiary hearing over the

---

[7] The humane practice rule requires that the Commonwealth prove beyond a reasonable doubt that the statement was voluntary before the jury may consider it. See Commonwealth v. Tavares, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982). If the voluntariness of the statement is contested, the judge must also find that it was proved beyond a reasonable doubt that the statement was voluntary. Id. The judge instructed the jury to examine the defendant's statements made during the interrogation in order to determine whether they were "the product of coercion, threats, physical or psychological intimidation, which had the result of overriding or overbearing the free will of the defendant."

course of six days in 2014.  She credited the following evidence introduced at the hearing.

a.  <u>The interrogation</u>.  According to the affidavit of the interpreter who had assisted the police at the time the defendant was interrogated in 1982,[8] despite the written statements, the defendant had actually neither stated that he acted as a lookout, nor that he threw a Molotov cocktail into the building.  Instead, the officers themselves suggested these details during the interrogation and then included them in the written statements that the defendant signed.  Although the first and second statements were interpreted from English into Spanish before the defendant signed them, the third statement, the only one in which he admitted to throwing a Molotov cocktail into the house, was not.  The interpreter also indicated that the defendant had been incoherent at the time he signed the second and third statements, and that even before his breakdown, the defendant had referred constantly to being possessed by the devil and to being the son of God.  He also told the interpreter

_____

[8] By 2014, the interpreter had moved to Puerto Rico. Although he initially agreed to travel to Massachusetts to testify at the evidentiary hearing, he later refused to appear voluntarily.  Insofar as relevant here, as the interpreter could not be compelled to appear, the motion judge allowed defense counsel to introduce into evidence a redacted version of the interpreter's affidavit, signed in 2009, for the purposes of this most recent new trial motion.

that he had injected heroin before coming to the station for the interrogation.

The defendant's two psychiatric experts at the new trial motion hearing testified that rather than psychosis, the defendant suffered from delirium tremens (DTs) at the time of his confession.  DTs, also known as alcohol withdrawal delirium, begins when a person who drinks a significant amount of alcohol abruptly reduces his alcohol intake.  It is a neurologic, neurocognitive disorder that disrupts neurotransmitters in the brain.  The condition is marked by derangement of mental processes resulting in disorientation, confusion, behavioral disturbances and hallucinations.  It leaves one highly suggestible, unable to process information reliably,  and unable to make rational decisions.

The symptoms of the condition worsen over the course of five days.  Within twelve hours, the person may be confused or agitated but knows where he is and who he is.  By the second day of withdrawal, the person may experience auditory hallucinations, as well as a sense of persecution.  The most characteristic symptoms of DTs develop on the third day, when the person may experience visual, tactile, olfactory, and auditory hallucinations.  From the third day onward, the person becomes extremely disoriented and agitated, and other functions of the nervous system start to break down.  The hallucinations

peak at day three or day four. DTs is an acute syndrome and subsides as the person recovers from alcohol withdrawal, typically beginning at around days five, six, and seven.

The defense introduced evidence that the defendant was particularly prone to DTs due to a prior serious head injury and a history of heavy drug and alcohol abuse: he drank approximately a case of beer a day and hard liquor, often beginning at about 9:00 A.M. He had been drinking more heavily than usual in the days prior to the fire, but following the fire, he dramatically reduced his intake. His girl friend's son and others saw him behaving in extreme, unusual ways they had never seen before. As a result, the defense experts opined that as the defendant arrived at the police station for the interview, forty-six hours after the fire, he was finishing day two of his withdrawal and entering day three, and he began to experience full-blown symptoms of DTs. He was very suggestible at this time and could not make rational decisions or process information reliably.

The defense experts also testified to their opinions concerning why the previous psychiatrists had diagnosed the defendant incorrectly. They hypothesized that because the previous psychiatrists did not examine him when his symptoms were most aligned with delirium, by the time the defendant was diagnosed, eight or more days after the fire, his alcohol

withdrawal had progressed such that the residual symptoms of DTs might present as a psychotic disorder.  One of the experts further hypothesized that the language barrier made it difficult to get a complete history, including the defendant's history of alcohol abuse.

b.  The fire science.  The defendant additionally presented two fire science experts who testified that more recent fire science research, some of which was not completed until 2005, had led to new protocols for evaluating the source of a fire. Applying these protocols to the fire in question, the experts both determined that, rather than being arson started with Molotov cocktails at multiple locations, the forensic evidence was equally susceptible to an interpretation that the fire was accidental, involved no flammable liquids, and had a single point of origin.  The experts explained that "flashover" likely took place:  flashover is a phenomenon that occurs when the fire goes from being controlled by fuel to being controlled by the oxygen available in the room depending upon the ventilation. Once flashover occurs, there is "full room involvement," where the intensity of the fire -- and, as a result, the burn patterns -- may vary depending upon the areas of ventilation.  Once this happens, the point of a fire's origin cannot be accurately identified because the fire causes the most damage in areas where there is more oxygen available, generally near doors and

windows.  They further explained that because irregular curved or pool-shaped patterns are common in postflashover conditions and may result from the effects of hot gases, smoldering debris and melted plastics, the presence of flammable liquids should be confirmed by laboratory analysis and should not be based on appearance alone.

The original fire investigators believed that the fire was arson because there were two apparently separate areas of heavier damage that did not appear to have communicated with one another.  However, the defendant's experts explained that the fire likely traveled from the living room into the hallway and kitchen because there was more oxygen in those areas.  One of the defense experts also opined that one of the original investigators' conclusions, i.e., that a burn pattern observed near the rear kitchen door was consistent with flammable liquid flowing under the door, was a misconception about fire science because experts now know that hot gases in one room can cause burning on the other side of a closed door.  Further, the blistering effect that was thought to be consistent with the use of flammable liquid is now known to be found in many types of fires, whether or not flammable liquids were present.

Ultimately, the defense experts opined that the fire was consistent with an accidental fire originating in the living

room or elsewhere, and spreading from there, but that the cause was undetermined.

3.  The motion judge's rulings of law.  The motion judge granted the defendant's motion for a new trial based on the psychiatric experts' diagnosis of DTs.  She concluded that the determination that the defendant had been suffering from DTs was newly discovered, reasoning that it could not have been uncovered by defense counsel's due diligence by the time of trial, and that it cast real doubt on the justice of the conviction, specifically the voluntariness of the defendant's confession, especially when combined with the coercive interrogation techniques used by the police.[9]  See, e.g., Commonwealth v. Cowels, 470 Mass. 607, 616-617 (2015).

She also determined that the fire science evidence was newly discovered because it did not exist at the time of trial and differed significantly from the principles relied upon at that time.  She concluded, however, that, by itself, the new science evidence did not cast real doubt on the justice of the

---

[9] The motion judge also found that information about the police officers' interrogation practices was newly discovered, but that it alone would not warrant a new trial.

defendant's conviction.  See Commonwealth v. Grace, 397 Mass. 303, 306 (1986).[10]

The motion judge alternatively ruled that the DTs diagnosis entitled the defendant to a new trial under a substantial risk of a miscarriage of justice analysis.  See Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001).  See also Commonwealth v. Randolph, 438 Mass. 290, 294 (2002).  She concluded that the fact that the defendant was experiencing DTs during the interrogation, combined with testimony about the interrogation techniques that were used, could lead a reasonable fact finder to conclude that the defendant's statements were involuntary.  In her view, this would have been a real factor in the jury's deliberations, especially in combination with the newly discovered fire science evidence, and provided a separate ground for a new trial.

---

[10] The judge explained that if a jury found that the defendant's statement that he threw a Molotov cocktail through the window was voluntary, then the Commonwealth's theory regarding arson would have been corroborated, so the new fire science alone would not suffice.  Although the defendant's statement may have corroborated the arson theory, we note that, on the other hand, the new fire science evidence may have caused the jury to question whether the fire was intentionally set and, therefore, whether the statement itself was corroborated.  See Commonwealth v. DiGiambattista, 442 Mass. 423, 430 (2004) (we require "corroboration that the underlying crime was in fact committed").  At any rate, the judge also recognized in a footnote that if the diagnosis of DTs or the questionable interrogation tactics undermined the voluntariness of the statements, the new fire science would cast further doubt on the justice of the conviction.

Although we do not agree that the DTs diagnosis was newly discovered,[11] we nevertheless affirm based upon the totality of the judge's findings and the "confluence of factors" analysis developed subsequent to her decision in this case.  Commonwealth v. Brescia, 471 Mass. 381, 396 (2015). See Commonwealth v. Ellis, 475 Mass. 459, 481 (2016); Commonwealth v. Epps, 474 Mass. 743, 767 (2016).

Discussion.  1.  Standard of Review.  A judge "may grant a new trial at any time if it appears that justice may not have been done."  Mass. R. Crim. P. 30 (b).  "Our decisions have crafted a latticework of more specific standards designed to guide judges' determinations . . . as to whether a new trial should be ordered."  Brescia, 471 Mass. at 388.  Examples include, "a serious doubt whether the result of the trial might have been different had the error not been made," (citation omitted), Randolph, 438 Mass. at 297 (unpreserved claim of nonconstitutional error); evidence "would probably have been a real factor in the jury's deliberations," Grace, 397 Mass. at

_____

[11] Because the defendant failed to demonstrate that the DTs diagnosis was not an available diagnosis at the time of trial, it cannot be considered newly discovered.  See Commonwealth v. Shuman, 445 Mass. 268, 272 (2005) ("evidence does not meet the test for 'newly discovered' evidence [if] it was available prior to trial").  To the contrary, defense experts at the motion for new trial hearing testified that DTs was widely recognized at the time, and that the defendant was experiencing a "textbook" demonstration of DTs symptoms at the time of his confession.

305 (newly discovered evidence); the behavior of counsel "[fell] measurably below that . . . from an ordinary, fallible lawyer [and such failing] likely deprived the defendant of an otherwise available, substantial ground of defen[s]e,'" Commonwealth v. Saferian, 366 Mass. 89, 96 (1974) (ineffective assistance of counsel).  See generally Brescia, supra at 388-391.

As mentioned in Brescia, 471 Mass. at 388, the principle of finality of convictions remains a valuable and important concept in our jurisprudence, see Commonwealth v. LeFave, 430 Mass. 169, 175 (1999), as does the principle that a defendant "is entitled to a fair trial but not a perfect one" (citations omitted). Brescia, supra at 391. Nevertheless, in rare cases, in order to fulfill the obligation incorporated in Mass. R. Crim. P. 30 (b) to determine whether "justice may not have been done," a trial judge may need to look beyond the specific, individual reasons for granting a new trial to consider how a number of factors act in concert to cause a substantial risk of a miscarriage of justice and therefore warrant the granting of a new trial.  See Brescia, 471 Mass. at 389-390, 391 n.11.  See also Epps, 474 Mass. at 767-768.  Where the trial judge grants the motion, the appellate court must determine whether the judge abused his or her discretion.  See Brescia, supra at 397.  See also Ellis, 475 Mass. at 476.

In the Brescia case, the motion judge concluded that justice may not have been done where the defendant's undetected stroke affected his ability to testify in a coherent manner, and could well have damaged his credibility with the jury. 471 Mass. at 387.  We affirmed the order granting a new trial even though none of the usual reasons for doing so (e.g., constitutional error, newly discovered evidence, or ineffective assistance of counsel) were present.  Id. at 387, 396-397. Similarly in the Ellis case, we concluded that the motion judge did not abuse her discretion in granting a new trial where a combination of newly discovered evidence together with other evidence presented at trial warranted it. 475 Mass. at 481.  There, the motion judge had focused on a conflict of interest that was newly discovered; the victim in that case, a police officer, had participated in a corruption scheme with the detectives who investigated his murder.  Id. at 465-466.  The defendant also presented evidence showing that the investigators failed to pursue other leads. Id. at 469-472.  We affirmed the motion judge's conclusion that these two factors could have acted in concert to influence the jury's deliberations, reasoning that the defendant could have argued that the corrupt detectives' priority was concealing their own wrongdoing, rather than identifying the killer.  Id. at 478, 481.

This case, too, presents a situation in which a confluence of factors combined to create a substantial risk of a miscarriage of justice.

2. Confluence of factors. The motion judge's analysis, which focuses on whether "justice may not have been done," Mass. R. Crim. P. 30 (b), aligns with our decisions in the Brescia, Epps, and Ellis cases. She considered the unique confluence of events in light of the totality of the circumstances, that is, the irregularities in the defendant's interrogation leading to his confession (including the defendant's neurologic condition) combined with the new fire science in determining that the defendant is entitled to a new trial.

a. The interrogation. The voluntariness of the defendant's statements was thoroughly argued at trial and considered by the jury. However, there are substantial differences between psychosis and DTs that may have made a real difference in the jury's verdict. Although psychosis is a mental disorder that does not necessarily cause cognitive impairment, DTs is a neurologic disorder with an underlying physical cause that disrupts the ability to process information and leaves one disoriented, confused, and highly suggestible. Because voluntariness was at issue, the jury were required to determine whether the defendant's statements were voluntary beyond a reasonable doubt before they were permitted to use them

in reaching their verdicts.[12]  See Commonwealth v. Tavares, 385
Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982).  The DTs
diagnosis, with its underlying physical rather than
psychological origin, could have been highly relevant to the
jury's consideration of the voluntariness and reliability of the
defendant's confession -- the most compelling part of the
Commonwealth's case.[13]  See id. ("a defendant's statement is
usually the key item in the proof of guilt, and certainly one of
overpowering weight with the jury" [quotations and citation
omitted]).  If the jury had concluded that the statements were

---

[12] Indeed, it seems evident that the jury were concerned
about the defendant's mental status insofar as they requested
transcripts of the psychiatrists' testimony, which were not
provided.

[13] This evidence does not fall neatly into one of the
categories usually relied upon to argue for a new trial.
Although the DTs diagnosis was "discoverable," and therefore not
"newly discovered" evidence, we cannot say that defense counsel
was ineffective for failing to discover it.  He relied upon the
expertise of others -- three psychiatrists who examined the
defendant while he was in custody opined that the defendant was
psychotic at the times they examined him, one opined only that
he was not suffering from a mental illness at the time of
questioning, and an expert witness retained by the defense
opined that the defendant was psychotic during the interrogation
-- in a field in which the attorney was not himself trained.  It
would be a high hurdle indeed to expect counsel to continue to
search for an alternative diagnosis where he reasonably could
not be expected to know that one existed.  See Commonwealth v.
Buck, 64 Mass. App. Ct. 760, 764 (2005).  This is especially so
where several different psychiatrists concluded that the
defendant had suffered from psychosis either during the
interrogation or after booking, even if the judge was later
persuaded that this diagnosis was incorrect.

not made voluntarily, then the Commonwealth's case would have been significantly weakened.

The defendant's condition was only one part of the problem with the interrogation. The motion judge made significant findings regarding the circumstances surrounding the defendant's confession. She credited the interpreter's sworn affidavit in which he stated that the police officers added their own accusations about the origin of the fire, e.g., that the defendant threw a "Molotov cocktail" into the building, into the statements they prepared for the defendant to sign. This significant flaw was compounded by the fact the third, and most incriminating, statement was not interpreted into Spanish before the defendant signed it.

In addition, three of the tactics used during his interrogation have the potential to elicit false confessions. See Commonwealth v. Tremblay, 460 Mass. 199, 208 (2011). Although not newly discovered evidence, we consider these flaws in evaluating whether justice requires a new trial under the totality of the circumstances. See Ellis, 475 Mass. at 480-481. First, although the defendant said that he had stopped at the location because he observed the fire and wanted to help people escape the building, the officers falsely told the defendant that a witness had placed him at the scene before the fire began. See note 4 supra. Second, the officers motivated the

defendant to confess; they said that if his friends had caused the fire, they might blame him, and he would be left "holding the bag." Third, the officers engaged in "formatting," meaning that they told the defendant some corroborating details, which the defendant then adopted as part of his confession: that he acted as a lookout for his friends; that there were three points of origin for the fire; and that the fire was started with Molotov cocktails. These details were later included in the written statements. Such tactics are of particular concern where, as here, a suspect is already suggestible and was never given a translation of the last, most critical statement. We note that the defendant claimed that he had never heard of a Molotov cocktail before the interrogation. Until the last statement, he denied causing the fire and repeatedly stated that he had sought to save children from the burning building. The fact that the defendant was suffering from DTs increased the possibility of a false confession.

b. The fire science. At trial the defense did not introduce any testimony to challenge the Commonwealth's arson experts. Although the new fire science evidence presented by the defendant at the hearing on the motion for a new trial certainly does not prove that the fire was accidental, it does provide an alternative theory as to cause (accidental, unknown origin) and explains that the burn patterns alone could not

prove that flammable liquids were involved. Thus, additional sources of evidence were necessary for the Commonwealth to meet its burden of proving arson. Had this new fire science evidence been available at the time of trial it might have changed the defense strategy. This new evidence could have provided a basis for the jury to question further the defendant's confession, as well as the Commonwealth's evidence regarding how the fire developed.

Conclusion. The loss of eight lives in the fire in 1982 was unquestionably tragic, and without a doubt must have weighed and must continue to weigh heavily on the victims' families as well as the community. Nevertheless, under our Constitution and system of laws, every criminal defendant is entitled to a fair trial where, to the extent possible, justice is done.

The DTs diagnosis, the information from the interpreter, and the data on coercive interrogation tactics all call into question whether the defendant's statements were made voluntarily. The new fire science provides an alternate theory regarding the start and spread of the fire. These factors taken together could have influenced the jury's verdict. Although the evidence presented in support of the defendant's motion for a new trial does not necessarily mean that he is innocent, the judge concluded, after what was clearly a painstaking review of the trial record, that justice was not done. See Ellis, 475

Mass. at 460.  We conclude that in reaching this determination, the judge did not abuse her discretion.  <u>Commonwealth</u> v. <u>Wright</u>, 469 Mass. 447, 461 (2014).  As a result, we affirm her order granting a new trial.

<u>So ordered</u>.