SUPERIOR COURT 
 
 COMMONWEALTH vs. STEPHEN A. PINA

 
 Docket:
 9384CR11574
 
 
 Dates:
 February 3, 2025
 
 
 Present:
 Peter B. Krupp
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM AND ORDER ON MOTION FOR NEW TRIAL
 
 

             In January 1996, a jury found Stephen A. Pina (“Pina”) guilty of murder in the first degree by deliberate premeditation for shooting Keith Robinson (“Robinson”) on February 26, 1993. Almost 25 years later, Pina filed a third motion for a new trial, asserting new factual arguments grounded in actual innocence. After an extended period for discovery and for the Commonwealth to consider and reconsider its position, an evidentiary hearing over four days, and extensive briefing, it is clear to the court that “justice may not have been done.” Mass. R. Crim. P. 30(b). Accordingly, the motion for a new trial is allowed.
BACKGROUND
            A.  Procedural History
            On October 27, 1993, defendant was indicted for first degree murder and unlawful possession of a firearm and ammunition. At all times, defendant has advanced a defense based on misidentification. A trial in February and March 1995 resulted in a hung jury and declaration of a mistrial. The Commonwealth dismissed the ammunition charge. At a new trial in January 1996, a second jury deliberated over six days and found defendant guilty of first degree murder and unlawful firearm possession.
 
                                                            -1-
 
            The Supreme Judicial Court (“SJC”) affirmed the conviction.[1] Defendant then filed a pro se motion for a new trial. It was denied in November 2000. A second motion for a new trial was denied in January 2004. None of the issues presented in the instant motion were, or could have been, presented in either of the earlier new trial motions.
            Defendant raises four new arguments in support of the instant new trial motion: (1) newly available DNA evidence from the murder weapon and from the lapel of Robinson’s jacket exclude defendant as a contributor; (2) the prosecutor failed to disclose to the defense police reports that potentially implicated a third party in the shooting (indeed, implicated the person who previously had possession of the murder weapon) and would have allowed a strong third- party culprit defense; (3) the prosecutor failed to disclose to the defense that the Commonwealth’s key drug-dependent eyewitness also suffered from various psychiatric conditions and was psychiatrically committed at the time she testified; and (4) newly developed scientific evidence about eyewitness identifications generally, including by people with certain psychiatric disorders, undermines the reliability of the eyewitness identifications.
            B.  The Trial Evidence
            On February 26, 1993, between 8:30 and 9 p.m., Keith Robinson (“Robinson”) was shot at the Mission Hill Housing Project (“Mission Hill”) between 25 and 31 Horadan Way in Boston. Robinson was shot in his right eye, upper left chest, and right thigh. He was pronounced dead
 
--------------------------------------------
 
            [1]        On direct appeal, defendant argued that the Commonwealth “exceeded the bounds of proper argument”; the judge abused his discretion by limiting defendant’s cross-examination of key witnesses; the judge should not have given a consciousness of guilt instruction, should have given a “consciousness of innocence” instruction, should not have given an instruction that was, in effect, an impermissible “missing witness” instruction, and used improper examples of “deliberate premeditation” in his instructions; and the verdict should be overturned under plenary review of G.L. c. 278, § 33E. Commonwealth v. Pina, 430 Mass. 266, 267-275 (1999).
 
                                                            -2-
 
shortly after being transported to Brigham and Women’s Hospital. Robinson was a known drug dealer in Mission Hill. He was outside selling drugs when he was killed.
            Defendant also sold drugs in Mission Hill. There was no evidence that defendant knew, or had any familiarity with, Robinson. There was no forensic, video, photographic, or cellular phone evidence tying defendant to the shooting.
            At trial, the central issue was identification. The Commonwealth’s case against defendant rested on the testimony of two people – Timothy Hall (“Hall”) and Debra Annas (“Annas”), also known as Debra Rocher – who described the shooting very differently. Both testified that they witnessed the shooting and identified defendant as the shooter, and both had serious credibility issues.
                        1. Relevant Eyewitness Trial Testimony
            For purposes of the new trial motion, it is important to summarize the details of the eyewitness testimony at trial.[2]
                                    a. Timothy Hall
            Hall was not a resident of Mission Hill. He came to the area by taxi on the evening of February 26, 1993, to buy heroin. He testified that he last used heroin the previous weekend. He was awaiting trial on a charge of assault and battery on a police officer and was on probation for armed robbery. Despite his pending charges, he testified that he did not expect any favorable treatment from the Commonwealth or District Attorney’s office in exchange for his testimony.
            Hall testified that he had only purchased heroin once from Robinson prior to February 26, 1993, and he did not know Robinson’s name before the shooting. Hall said that, on February 26,
 
--------------------------------------------
 
            [2]        In deciding defendant’s direct appeal, the SJC summarized the trial evidence in six paragraphs, but did not focus on the material differences between the accounts by Hall and Annas or the potential credibility challenges to their testimony. Pina, 430 Mass. at 267-269.
 
                                                            -3-
 
1993, while he was negotiating with Robinson to buy heroin for himself and his friends, he noticed a man emerge from the crowd “ten yards [away], fifteen at most,” walking towards him and Robinson at a “moderate pace.” Hall testified that the man was “about [his] height, lighter complexioned, [and] heavy-set.” There was no indication that Hall had ever seen the man before. When the man was “within ten feet,” Hall “could hear him singing,” but he did not recall “absolutely” what the words were, “[s]omething like . . . ‘[g]ive me your shit or I’ll bust you with my click’ . . . something to that effect.” The man grabbed Robinson “by either his collar or his lapel,” and Robinson “spun around . . . like he was trying to ward him off.” While still holding Robinson’s jacket, the man fired “[a]t least four” shots. Robinson fell backwards to the ground. Only about 20 seconds elapsed from the time Hall first saw the shooter until the shooting stopped and the shooter ran away toward McGreevy Way.
            Hall described the shooter as approximately 5’9”, 23-26 years old, and weighing 160-180 pounds. Hall said the shooter was “wearing a black knit hat, a red . . . winter waist-length jacket, dark pants, and dark shoes.”[3] At trial, Hall identified defendant as the shooter. But when the police showed Hall a photo array on the night of the shooting,[4] Hall selected a photo of defendant, stated “I think that’s the person,” and described his confidence as six out of ten.[5] At
 
--------------------------------------------
 
            [3]        This description differed from the man Off. O’Loughlin saw shortly after the shooting. Although Off. O’Loughlin did not see the shooting and was unable to identify the shooter, after hearing shots and seeing people running down Horadan Way, he saw a “heavyset” black male wearing all black, including a black stocking cap,” run across Parker Street toward Annunciation Road. Off. O’Loughlin testified that defendant was dressed the same way when he (Off. O’Loughlin) saw him around 4:30 p.m. that day.
            [4]        A police officer testified that the photo array consisted of eight photos. Hall testified that it contained “between sixteen and twenty” photos.
            [5]        Between the first photo array and trial, the police showed Hall another photo array, potentially fortifying Hall’s level of certainty. Under current law, the Commonwealth would not be permitted to offer an in-court identification by Hall because his prior identification
 
                                                            -4-
 
trial, Hall testified that actually he had been “a hundred percent certain,” but he did not want to say that because he “was starting to have second thoughts and just didn’t want to get involved all
of a sudden.”
                                    b.  Debra Annas[6]
            Annas lived in Mission Hill for her entire life (35 years). She had known defendant for “maybe a year and a half, two years.” He lived “across the way from [her]” on Horadan Way. For a couple of months before the shooting she had purchased drugs from him, including “[e]very night” in February 1993. Defendant normally would sell heroin by standing in front of the house on Horadan Way where he lived with his girlfriend.
            Annas testified that between 8:30 and 9 p.m. on the night of the shooting, she went to “the area of 31 Horadan Way” with her friend “Mickey” to buy heroin. She did not see defendant outside as she normally would. As she approached 31 Horadan Way, she saw a crowd of 15-25 people in the area, which was a normal crowd for that time in the evening. Annas asked Robinson and a few others for drugs. Robinson did not have the type of drugs Annas wanted, so she did not buy from him.
            According to Annas’ trial testimony, at about 9 p.m., she was standing on the corner of 31 Horadan Way[7] when she saw a “maroonish color car” pull up “very fast” “from the Parker St.
 
--------------------------------------------
 
was not unequivocal. See, e.g., Commonwealth v. Collins, 470 Mass. 255, 266 (2014) (“where an eyewitness to a crime has not made an unequivocal positive identification of the defendant before trial” “there rarely will be” “‘good reason’ for the suggestive in-court identification of the defendant”). Clearly, the police did not view Hall’s identification from the photo array on the night of the shooting as being unequivocal; defendant was not arrested until months after the shooting.
            [6]        When the Commonwealth initially called Annas as a witness, it was reported that she had gone to the bathroom and was “sick.” Defense counsel requested a voir dire to determine why she was sick. The trial court denied the request.
 
                                                            -5-
 
side of Horadan Way” and slam on its brakes. Annas testified that defendant exited the passenger side of the car, which had two doors and a trunk. She did not know the make or model of the vehicle.[8] Annas stated that she was close enough and the lighting was sufficient so she “did not have any difficult [sic] seeing the individual’s face.” Annas testified that she saw defendant dressed in “dark clothing”[9] approach Robinson “really fast” in a way that demonstrated that defendant was “very angry,” at which point Robinson and defendant “started to argue.” Annas testified that the two men were “very close” while arguing, and she was not far from where they were arguing and had no “problems seeing the defendant’s face at that time.” Annas said the argument probably lasted less than a minute. She testified that she could only clearly hear defendant, who made comments “about drugs, something about a ring,” but she “wasn’t listening to the whole thing.”
            After the argument, Annas saw defendant return to the passenger side door of the car he arrived in and retrieve a gun from between the seats. Annas said she could see a gun in defendant’s hand as he again approached Robinson.[10] Annas testified that defendant “heavily
 
--------------------------------------------
 
            [7]        This testimony was inconsistent with her later testimony that she was able to back up a few feet into a building.
            [8]        The parties stipulated that, at the time of the shooting, defendant owned a red 1981 Chevrolet Chevette, which was registered to “Charles Pina,” a name defendant used when he registered the car. Other witnesses at trial, including Off. Moschella and Off. O’Loughlin, described seeing defendant’s car sporadically in Mission Hill prior to the shooting and testified that it was a maroon four-door Chevrolet. Both officers testified that they would at times see defendant’s friend Demetrius Burton driving the car instead of defendant.
            [9]        Unlike Hall, Annas did not say the shooter was wearing a red jacket.
            [10]      Hall’s testimony differed materially from Annas’ testimony in many regards. Hall did not describe any involvement by a car, did not describe any type of argument, did not describe the shooter encountering Robinson more than once, did not observe the shooter to approach Robinson “really fast,” and did not see the shooter in possession of a gun before the shooter grabbed Robinson and removed an object from his (the shooter’s) pocket.
 
                                                            -6-
walked really fast towards” Robinson while “singing some kind of . . . rap song.” During the “seconds” that it took defendant to return to Robinson, Annas said she began backing up into the hallway of the building that was behind where she was standing, but she said she “never turned her back,” just “her head.” As she was backing up into the hallway, Annas saw “a flash” out of the gun, and “saw him shoot Stephen -- shoot Keith in the face.” She heard more shots. The firing was over in seconds. Annas saw Robinson fall and defendant run towards McGreevy Way. Annas went and stood near Robinson, who was bleeding, until the police arrived in about a minute.
            Annas did not immediately report what she had seen to the police. She testified “you don’t run to the police in the projects.” Det. John McCarthy testified to interviews he conducted with Annas on April 18, 1993, and September 8, 1993. Annas, however, could not say when – or even during which months – she had spoken to the police about Robinson’s murder and she often could not say with which officers or detectives she had spoken.
            Annas testified that the first interaction she had with police after Robinson’s shooting occurred “several months” later, after an unrelated killing of her friend, James Clark. She testified that the first time she was shown a photo array of suspects in the Robinson shooting was when she was taken out of a “base house” – a place where people use crack cocaine – by Off. Moschella and Off. O’Loughlin “maybe a month or more” after the killing of James Clark. She said she was taken to speak with Det. John McCarthy. Off. Moschella and Off. O’Loughlin testified that this occurred in September 1993. During Annas’ first meeting with Det. McCarthy she was shown defendant’s photograph, but she did not identify him as having shot Robinson. See, supra, at 4-5 n.5. The second time she met with Det. McCarthy, Annas identified
defendant’s photo as “the person that shot Keith.”
 
                                                            -7-
 
                        2. Third-Party Culprit Evidence
            At trial, there was evidence of another person with a possible motive for the shooting. Off. Moschella and Off. O’Loughlin, both Mission Hill Housing Police Officers, testified at trial that around 5 p.m. on the day Robinson was killed they encountered two men walking on Annunciation Road, which is about a half block from Horadan Way, and one of them was bleeding profusely from the head. (Off. Moschella’s report of the incident indicated the individual was “bleeding profusely from a wound to his right eye area.”) The man who was bleeding stated that he had been robbed “in the area of 60 and 68 Annunciation Road,” and he directed the officers towards the man who had allegedly committed the robbery.
            Both officers testified that they saw the alleged robber entering an apartment farther down Annunciation Road, although the distances they gave broadly ranged from 20 to 100 yards. Off. Moschella testified that she could see the alleged robber’s face. Off. O’Loughlin said he could not. Both officers testified that the alleged robber was a black male, with a medium build, about 5’10” tall, weighing about 160-170 pounds, and wearing a red jacket. Off. Moschella also described the alleged robber as being “medium-skinned” and having “cropped hair.”
            The description of the Annunciation Road robber was consistent with the physical description of Robinson. According to Robinson’s Autopsy Report, he was 26 years old, 5’9¼” inches tall, and weighed 155-160 lbs. His hair was close-cropped, with a maximum length of ¼ inch. And, at the time of the shooting, Robinson was wearing a red or predominantly red jacket.[11]
 
--------------------------------------------
 
            [11]      Off. O’Loughlin responded to the scene of the shooting within minutes and observed Robinson and the clothing he was wearing at the time he was shot. Off. O’Loughlin testified that he thought that Robinson might have been the Annunciation Road robber because of the red coat. The autopsy report states that the Medical Examiner’s Office received Robinson’s clothing from Brigham and Women’s Hospital, including a “red and blue jacket.”
 
                                                            -8-
 
            After Robinson was shot, both Off. Moschella, who testified she had seen the Annunciation Road robber’s face, and Off. O’Loughlin linked the robbery to the shooting; both reported to a detective that they believed Robinson was the alleged robber seen earlier in the day on Annunciation Road. Off. Moschella stated that both the robber and Robinson were wearing red jackets. Both officers acknowledged at trial the physical similarities between the alleged robber and the victim. Nonetheless, Off. Moschella testified at trial that she “had never seen [the robber] before in [her] life” and she was “positive” that the alleged robber was not Robinson, who she had met once in early February 1993.[12]
            The bleeding man who said he had been robbed was described as a “tall, thin black male,” 23-25 years old, with “medium to dark” skin. The other man with him, who was definitely not defendant, was described as a black male, around 5’9” or 5’10” and “a little heavier build,” wearing “a black knit cap, black pants, and a black jacket.” At trial, no one provided the name of either the bleeding man or his companion. Off. Moschella testified that the bleeding man “refused to give . . . his name,” “refused to cooperate in any way,” and refused medical attention, but told the officers “[d]on’t worry, I’ll take care of it myself.”
 
--------------------------------------------
 
            [12]      The testimony of Robinson’s girlfriend, Rochelle Dance (“Dance”), also suggested that Robinson was not the Annunciation Road robber. Dance testified that on February 26, 1993, she lived with her mother, her sister, Robinson and his four-year-old son in Mission Park, which is down the street and a couple of minutes away from Mission Hill. On the day Robinson was killed, she left home at about 10 a.m. to go to work in Newton Center, and worked from 10:30 a.m. to 3:30 p.m. Dance took the MBTA green line’s D branch train between Brookline Village (Dance said it was a 3-4 minute walk from her home) and Newton Center. Dance told the jury that she returned home no later than 4 p.m. She said that, after changing her clothes, she left the house, walked up the street, and bought Chinese food, but was only gone for 6-8 minutes. She said she returned home to eat with Robinson and his son and they finished eating around 6:30 p.m. Other than when she went out to buy dinner, Dance said that she was with Robinson from 4 p.m. until he left the house around 7:15 or 7:30 p.m.
 
                                                            -9-
 
                        3. Other Relevant Trial Evidence
                                    a. Statements by Defendant
            At trial, the Commonwealth introduced a statement defendant made earlier on the day of the shooting about wanting to set an example and wanting his money. Linda Taylor, a woman who sold drugs for defendant, testified that on February 26, 1993, she saw defendant in possession of a firearm and heard him say that “today was the day that he was going to set an example because he was not going to be played anymore.” There was no testimony at trial that Robinson and defendant knew, or had any relationship with, one another, or that Robinson owed defendant any money.
            There was also testimony about an ambiguous statement defendant made to a police officer two and a half weeks after the shooting. Off. O’Loughlin testified that two and a half weeks after Robinson was killed he (Off. O’Loughlin) drove up next to defendant on the street and said “he had heard that the defendant wanted to take a ‘pot shot’ at him. The defendant replied that O’Loughlin saw what he had done down there (pointing in the vicinity of Horadan Way) and that ‘nothing came of that.’”
            Both of these statements – the statements reported by Linda Taylor and those reported by Off. O’Loughlin – were inconclusive, whether considered individually or together.
                                    b.  The Murder Weapon
            The murder weapon, a revolver containing four discharged cartridge cases and one live round, was recovered from a snowbank on McGreevy Way, a street running parallel and next to Horadan Way.
            At trial, the court struck testimony by Det. McCarthy that a man named Robert Grady (“Grady”) owned the revolver. The parties were aware that Grady’s son, Brian Johnson
 
                                                            -10-
 
(“Johnson”), had stolen the gun from Grady at some point; that Johnson had it with him sometime in the late part of February 1993; that Shawn Wright (“Wright”), a friend of Johnson’s, had had access to the gun (having pointed it at his girlfriend); and that Wright was a “dark complexioned black male” about 28 years of age. The court refused to allow defense counsel to inquire about these facts, even to establish that the police had failed to investigate other leads.[13] Notably, nothing linked defendant to Johnson, Wright, or the gun. The defense was not aware of any information linking Johnson or Wright to the Annunciation Road robbery that occurred three and a half to four hours before Robinson was shot.
            No fingerprints or other types of forensic evidence were recovered from the firearm or other ballistics evidence.
            C. The Third Motion for New Trial
            Based on the submissions of the parties and the credible evidence at the hearings, I make the following findings of fact bearing on the instant new trial motion, many of which the Commonwealth does not dispute.
                        1. Debra Annas
                                    a. Psychiatric Hospitalization
            For Annas to attend and give testimony at trial on January 17, 1996, she had to be transported from the Taunton State Hospital, a psychiatric hospital where she was being held following a suicide attempt at MCI Framingham. When she testified, she stated that she was incarcerated at the time of her testimony. While technically true, there was no mention during
 
--------------------------------------------
 
            [13]      See Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980) (“The failure of the authorities to conduct certain tests or produce certain evidence was a permissible ground on which to build a defense The fact that certain tests were not conducted or certain police procedures not followed could raise a reasonable doubt as to the defendant’s guilt in the minds of the jurors.”).
 
                                                            -11-
 
her testimony that she was being held at a psychiatric hospital, or that she was being treated for, or had been diagnosed with, any psychiatric disorder.
            At the time of trial, and for some time before, a Boston homicide detective knew of Annas’ psychiatric hospitalization. As is evidenced by a note from the lead detective to the prosecutor with the name and contact number for Annas’ psychologist at Taunton State Hospital, the prosecutor also knew that Annas had been hospitalized. On January 10, 1996, the Commonwealth procured a writ of habeas corpus from the Criminal Clerk’s Office to the Superintendent of the Taunton State Hospital to compel Annas’ appearance at trial.[14]
            The Commonwealth did not disclose Annas’ psychiatric hospitalization to the defense, nor did it disclose that Annas suffered from any mental health conditions. Had defendant known of Annas’ psychiatric hospitalization, he would have sought discovery to learn about Annas’ psychiatric diagnoses and mental health history and could have presented that information to the jury as a basis to question Annas’ credibility.
                                    b.  History of Mental Health Conditions
            In fact, Annas had a long history of mental health conditions, which was not known to the defense. Annas reported to the Taunton State Hospital that she had previously been admitted to no less than nine other medical or mental health facilities for psychiatric hospitalizations. She had been diagnosed with mixed personality disorder with antisocial and borderline features, recurrent major depression, and polysubstance abuse, and had been treated with a variety of medications. She also claimed to have an eating disorder. Although there is no indication that the
 
--------------------------------------------
 
            [14]      Annas was admitted to the Taunton State Hospital pursuant to G.L. c. 123, § 18(a), on October 26, 1995, and remained there until after her trial testimony in this case. Given the importance of Annas’ testimony for the Commonwealth’s case, it is likely that the lead detective knew Annas had been hospitalized well before the start of the second trial in January 1996, but I cannot be certain.
 
                                                            -12-
 
prosecution actually knew of these conditions at the time of trial (although all parties knew she was a drug user), the defense is likely to have discovered this information if the Commonwealth had disclosed the fact that Annas was psychiatrically hospitalized at the time of her trial testimony.
                        2. Third Party Culprit Evidence
            On the night Robinson was killed, three men used a gun to steal a maroon Nissan Maxima (Mass. Reg. 516BWH) (“the Stolen Nissan”) from a man on Elm Hill Avenue in Roxbury, which is a couple miles away from where Robinson was shot. The Stolen Nissan had four doors and a trunk, generally matching the description of a maroon car that Annas said was involved in the Robinson shooting.
            At about 10:40 p.m., the owner of the Stolen Nissan, Pierre Thelismond, went to the B-2 police station and reported the vehicle stolen. There is some indication that Mr. Thelismond had some difficulty speaking English. He reported to the police that he was in the vehicle and forced out at gunpoint. The police officer who took the report recorded that the incident reportedly occurred at 10 p.m. on February 26, 1993.[15]
            Two weeks later, on March 12, 1993, the police stopped the Stolen Nissan while investigating an unarmed robbery. In the Stolen Nissan, which was the same color as the car Annas said she saw at the time Robinson was killed, the police found Johnson, who had stolen the murder weapon used to kill Robinson, and Anthony Woods (“Woods”). According to the police records related to the arrest of Johnson and Woods, Johnson was a 24-year-old black
 
--------------------------------------------
 
            [15]      The records related to the report of the car theft are confusing and inconsistent with the narrative provided in the BPD Form 1.1. The Stolen Vehicle Report & Recovery Document lists that the motor vehicle was last seen at 9:30 p.m. on February 26, 1993, and it was discovered stolen at 10 p.m. on February 27, 1993, and lists the “Date of Theft” as February 27, 1993. In addition, it lists the vehicle’s color as read.
 
                                                            -13-
 
male, 5’9” tall, 140 pounds, with a slim build, light complexion, and a “scar with [ILLEGIBLE][16] right side of forehead prior to arrest.” In Johnson’s booking photograph from that arrest, a scar is evident over Johnson’s right eye and does not appear to be fully healed.
Johnson’s head injury was consistent with the head injury that officers saw on the victim of the Annunciation Road robbery on the night of Robinson’s murder. Woods is described as a 22-year- old black male, 5’11”, 250 pounds, with a heavy build and medium complexion. Woods’ physical description is similar to the description of Robinson’s shooter, and his booking photograph bears a fairly close resemblance to defendant.
            All of this information was known to the police, but none was disclosed to the defense. The prosecutor was aware that Johnson and Woods were being prosecuted for armed robbery and other charges, and was tracking the progress of their cases. However, the Commonwealth did not disclose the information about the stolen car, Johnson’s presence in the stolen car, or Johnson’s head injury, which would have allowed the defense to argue that there was a strong link between the Annunciation Road robbery and Robinson’s murder.[17]
                        3. D NA Results
            The ability to test for touch DNA, or other mixtures containing very low levels of DNA, was not available at the time of defendant’s trial. Indeed, the probabilistic genotyping, which yielded the new information in this case, was not available until after defendant’s last motion for a new trial. See Randolph v. Commonwealth, 488 Mass. 1, 5 n.7, 12 (2021); Commonwealth v.
 
--------------------------------------------
 
            [16]      The illegible word here may be “stitches.”
            [17]      At the time of trial, in addition to Johnson’s tie to the weapon, the defense knew that Johnson had been arrested on March 12, 1993, that he had been charged with robbery, and that he was incarcerated at least until May 1994. None of this information suggested a link between Johnson and the Annunciation Road robbery.
 
                                                            -14-
 
C lark, 472 Mass. 120, 132 n.13 (2015). See also, e.g., United States v. Gissantaner, 990 F.3d 457, 462 (6th Cir. 2021); United States v. Anderson, 673 F. Supp. 3d 671, 674, 677-678 (M.D. Pa. 2023) (probabilistic genotyping software program TrueAllele “has been tested and validated, subjected to peer review, and broadly accepted in the field of forensic science”); United States v. Lewis, 442 F. Supp. 3d 1122, 1126, 1155 (D. Minn. 2020) (probabilistic genotyping software program STRmix “has gained general acceptance within the relevant scientific community”).
            In 2015, Robinson’s red jacket and four swabs from the murder weapon[18] were submitted to Cellmark Forensics (“Cellmark”), a private testing laboratory, for DNA testing that was not available at the time of trial. Cellmark was also provided with the known DNA samples from Robinson and from defendant. In mid-2015, Cellmark tested the samples provided, using the Applied Biosystem’s Identifiler Plus (“IDP”) DNA testing kit. Testing on the swabs from the murder weapon was inconclusive because an insufficient amount of DNA was detected. Testing of swabs taken from the lapel and hood areas of Robinson’s jacket, which was the area of Robinson’s jacket that Hall testified the shooter grabbed, was consistent with a major and minor contributor. Robinson was consistent with, and defendant was excluded from being, the major contributor. Cellmark, however, could not assess the minor contributor because of insufficient amounts of DNA detected from the minor contributor.
            In 2018, the Cellmark data was sent to Cybergenetics, a DNA analysis firm, so that Cybergenetics could analyze the data using its TrueAllele probabilistic genotyping software.
 
--------------------------------------------
 
            [18]      The swabs were taken from the front grip (Item 2.1), the barrel and cylinder (Item 2.2), the trigger (Item 2.3), and the hammer (Item 2.4).
 
                                                            -15-
 
Cybergenetics’ May 2018 report supports defendant being excluded from being the contributor to the DNA mixtures found on the grip and on the cylinder and barrel of the murder weapon.[19]
            Cybergenetics also used TrueAllele to analyze the DNA mixture detected by Cellmark on Robinson’s jacket. Cybergenetics’ March 2022 report supports defendant being excluded from being a contributor to the DNA mixtures found on the inner right side of the jacket’s lapel and lower hood, and from the outer left side of the jacket’s lapel and lower hood.[20]
                        4. Expert Testimony about Eyewitness Identifications
            Defendant was tried almost two decades before the SJC prescribed the use of an instruction on the factors that may affect the reliability of eyewitness identifications. See Commonwealth v. Gomes, 470 Mass. 352 (2015). He now asserts that newly discovered scientific evidence about the factors that affect memory in the context of eyewitness identification, and which relate directly to the two identifications in this case, raise substantial questions about the reliability of the eyewitness identifications by Hall and Annas, and suggest that justice was not done in this case.
            In this regard, I credit the testimony of Dr. Nancy Franklin, as well as her report (as corrected during her testimony), which significantly tracks, or at least is consistent with and builds upon or updates, the concepts recognized in Gomes. Notably, defendant also points to new
 
--------------------------------------------
 
            [19]      Cybergenetics reported that a match between the DNA on the grip of the firearm and defendant is “25.1 times less probable than a coincidental match to an unrelated African- American person” and that a match between the DNA collected from the cylinder and barrel of the firearm and defendant is “52.5 times less probable than a coincidental match to an unrelated African-American person.”
            [20]      Cybergenetics reported that a match between the DNA on the jacket lapel inner right side and lower hood and defendant is “5.4 million times less probable than a coincidental match to an unrelated African-American person” and that a match between the DNA collected from the jacket lapel outer left side and lower hood and defendant is “19.1 thousand times less probable than a coincidental match to an unrelated African-American person.”
 
                                                            -16-
 
scientific evidence about the affects of certain mental health conditions on the reliability of eyewitness identifications, including borderline personality disorder and long-term polysubstance use disorder, which is not addressed in Gomes, but which he contends would bear directly on Annas’ identification given what is now known about Annas’ various mental health diagnoses. See Expert Report: Eyewitness Identification by Nancy Franklin, Ph.D. ¶¶ 38-44 (and studies cited therein).
DISCUSSION
I. The Rule 30 Standard
            A. General Principles
            A trial judge may grant a motion for a new trial “at any time if it appears that justice may not have been done.” Mass. R. Crim. P. 30(b). Such decision is “committed to the sound discretion” of the court. Commonwealth v. Henry, 88 Mass. App. Ct. 466, 451 (2015), quoting Commonwealth v. Scott, 467 Mass. 336, 344 (2014).
            In litigating a new trial motion, a defendant must bring all claims that could be raised in its earliest filed motion. Where, as here, a defendant has appealed his conviction and previously moved for a new trial under Rule 30(b), any claims which were previously available to the defendant, but were not previously raised, “are waived unless the judge in the exercise of discretion permits them to be raised in a subsequent motion, or unless such grounds could not have been raised in the original or amended motion.” Mass. R. Crim. P. 30(c)(2). See Rodwell v. Commonwealth, 432 Mass. 1016, 1017 (2000) (rescript).
            Assuming the defendant identifies a meritorious claim for relief, the defendant still “has the burden of producing a credible reason to reverse the final decision, arrived at after trial or plea, that outweighs the risk of prejudice to the Commonwealth.” Commonwealth v. Wheeler, 52
 
                                                            -17-
 
Mass. App. Ct. 631, 637 (2001). See Commonwealth v. Ng, 489 Mas. 242, 248 (2022). In deciding whether to grant a new trial, the court must consider both that “the principle of finality of convictions remains a valuable and important concept in our jurisprudence,” Commonwealth v. Rosario, 477 Mass. 69, 77 (2017), and “that a defendant ‘is entitled to a fair trial but not a perfect one.’” I d., quoting Commonwealth v. Brescia, 471 Mass. 381, 391 (2015).
            There are a number of bases for granting a motion for new trial, including the discovery of new evidence, the non-disclosure of exculpatory evidence at trial, and defense counsel’s provision of ineffective assistance. I address these bases below. Outside of specifically considered factors, however, there remains the general principle that the court has the power to grant a new trial wherever “it appears that justice may not have been done.” Brescia, 471 Mass. at 388, quoting Mass. R. Crim. P. 30(b). Thus, even in the absence of specific error or newly discovered evidence, the court may evaluate the trial holistically, “look[ing] beyond the specific, individual reasons for granting a new trial to consider how a number of factors act in concert to cause a substantial risk of a miscarriage of justice and therefore warrant the granting of a new trial.” Rosario, 477 Mass. at 77-78. See Brescia, 471 Mass. at 389-90.
            B.  Specific Factors
                        1. Newly Discovered Evidence
            A new trial may be granted based on newly discovered evidence. “Where the defendant moves for a new trial on the basis of newly discovered evidence, the defendant ‘must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction,’ which entails a showing that it ‘probably would have been a real factor in the jury’s deliberations.’” Commonwealth v. Drayton, 473 Mass. 23, 31 (2015), quoting Commonwealth v. Grace, 397 Mass. 303, 305-306 (1986); Commonwealth v. Cowels, 470 Mass. 607, 616 (2015).
 
                                                            -18-
 
“To establish that evidence is ‘newly discovered,’ the defendant must show that the evidence was ‘unknown to the defendant or his counsel and not reasonably discoverable by them at the time of trial’” Drayton, 473 Mass. at 39, quoting Grace, 397 Mass. at 306, “or at an earlier motion for a new trial.” Commonwealth v. Ellis, 475 Mass. 459, 472 (2016).
            Newly discovered evidence may include new facts obtained by the defense, whether they were known or unknown to the prosecution at the time of trial, see, e.g., Commonwealth v. Moore, 489 Mass. 735, 748-749 (2022) (call detail records); Ellis, 475 Mass. at 470-474 (victim’s complicity in police corruption), or “new research” not available at the relevant earlier time. See, e.g., Commonwealth v. Gaines, 494 Mass. 525, 539 (2024) (developments in eyewitness research); Commonwealth v. Epps, 474 Mass. 743, 767 (2016) (new research on shaken baby syndrome); Commonwealth v. Sullivan, 469 Mass. 340, 349 (2014) (more sophisticated DNA analysis); Commonwealth v. Carver, No. 8877CR13527, “Memorandum of Decision and Order on Defendant’s Fifth Motion for New Trial (Paper No. 159)” at 41-48 (Mass. Super. Dec. 23, 2024) (Karp, J.) (developments in fire science).
            In determining whether new evidence raises “real doubt” about the justice of a conviction, the court must consider several factors, including (1) whether the newly discovered evidence is “cumulative of” or “different in kind” from the evidence presented at trial; (2) whether “there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial;” and (3) “the strength of the case” brought by the Commonwealth. Cowels, 470 Mass. at 617, quoting Grace, 397 Mass. at 306.
                        2. N on-Disclosure of Exculpatory Evidence
            A prosecutor bears a “constitutional obligation to disclose exculpatory information” as well as a “broad obligation under our rules to disclose any facts that would tend to exculpate the
 
                                                            -19-
 
defendant or tend to diminish his or her culpability.” Commonwealth v. Pope, 489 Mass. 790, 798 (2022), quoting Matter of a Grand Jury Investigation, 485 Mass. 641, 649 (2020). A new trial motion may be predicated on a prosecutor’s failure to meet these disclosure obligations prior to trial.
            “To obtain a new trial on the grounds that the Commonwealth failed to disclose certain exculpatory evidence, ‘a defendant must establish (1) that the evidence [at the time of trial] was in the possession, custody, or control of the prosecutor or a person subject to the prosecutor’s control, (2) that the evidence is exculpatory, and (3) prejudice.” Pope, 489 Mass. at 798, quoting Commonwealth v. Caldwell, 487 Mass. 370, 375 (2021). See Gaines, 494 Mass. at 541. “[I]nherent” in applying this standard is that the information “was actually undisclosed” and that it “is newly discovered.” Pope, 489 Mass. at 798. See Commonwealth v. Rodriguez-Nieves, 487 Mass. 171, 176-177 (2021).
                        3. Ineffective Assistance of Counsel
            A motion for new trial may be based on a claim of ineffective assistance of trial counsel. Such a claim must be analyzed under “the typical test” in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). Ng, 489 Mass. at 249. Specifically, a defendant advancing such an ineffective assistance claim in support of a new trial motion must prove that his counsel’s “representation fell ‘measurably below that which might be expected from an ordinary fallible lawyer,’ and that the performance inadequacy ‘likely deprived the defendant of an otherwise available, substantial ground of defence.’” Commonwealth v. Kolenovic, 471 Mass. 664, 673 (2015), quoting Saferian, 366 Mass. at 96. “[T]he burden of proving ineffectiveness rests with the defendant.” Ng, 489 Mass. at 249; Kolenovic, 471 Mass. at 673, quoting Commonwealth v. Montez, 450 Mass. 736, 755 (2008).
 
                                                            -20-
 
            In some cases, an ineffective assistance claim masks a post hoc challenge to a tactical choice made during trial. In this regard, the court must review the actions of trial counsel “with some deference to avoid characterizing as unreasonable a defense that was merely unsuccessful.” Kolenovic, 471 Mass. at 673, quoting Commonwealth v. Valentin, 470 Mass. 186, 190 (2014).
II.  Defendant’s Factual Bases for New Trial
            For the following reasons, I find several of defendant’s bases for a new trial, alone or taken together, strongly indicate that justice may not have been done in this case. Accordingly, I vacate defendant’s conviction and grant his motion for a new trial.
            A. N on-Disclosed Exculpatory and New Evidence
            The Commonwealth’s failure to disclose that Annas was psychiatrically hospitalized prior to and at the time of trial, and the newly discovered facts potentially linking Johnson, the person who was known to be in possession of the murder weapon in late February, and/or his associates, to the Annunciation Road robbery, violated the Commonwealth’s constitutional obligation to disclose exculpatory evidence or amount to newly discovered evidence warranting a new trial. The information about Annas’ hospitalization was known to and in the possession, custody or control of the prosecutor or police officers subject to the prosecutor’s control; the evidence was exculpatory; and defendant was prejudiced by the nondisclosure. The facts linking Johnson to the Annunciation Road robbery may have been known to the prosecution team, but I cannot so find. Accordingly, I analyze that material as newly discovered evidence.
            The lead detective in this case provided the prosecutor with the contact information for Annas’ treatment provider at the Taunton State Hospital. Moreover, a week before Annas testified, and two days before the jury was sworn, the Commonwealth procured a writ of habeas corpus to the Taunton State Hospital to procure Annas’ attendance at trial. The Commonwealth
 
                                                            -21-
 
clearly knew that Annas was psychiatrically hospitalized at the time of her testimony, but did not share that fact with the defense.
            If the defense had known of this hospitalization, it would have surely brought out the fact of her hospitalization as a basis to attack her credibility (i.e., she was not just in custody, but was being held in a psychiatric facility). In addition, defendant could have reasonably pursued discovery, at a minimum, of the records from Taunton State Hospital.[21] These records would have revealed Annas’ long history of mental health hospitalizations and diagnoses, including diagnoses which raise questions about the reliability of her eyewitness identification. See, infra, at 29.
            This is not a situation where there was a mountain of other evidence available to convict defendant. Annas was the key to the Commonwealth’s case. There was no forensic, video, photographic or other hard evidence linking defendant to the shooting. There was no evidence that defendant knew Robinson or had any motive to shoot Robinson.[22] Undermining Annas’ credibility was crucial to the defense. The Commonwealth’s failure to disclose the fact that Annas was psychiatrically hospitalized, which likely would have led to the discovery of
 
--------------------------------------------
 
            [21]      The Taunton State Hospital records list at least nine locations where Annas had previously received psychiatric treatment. Defendant may well have sought to obtain those records as well. Those records are not before me. I do not know what they would have shown.
            [22]      The only motive evidence, such as it was, came from Linda Taylor. She testified that on the day of the shooting defendant said he was going to “set an example” because he did not want “to be played anymore.” This general motive evidence “to set an example” was expressly linked to people who owe defendant money. There was no evidence that Robinson owed defendant money, or even that defendant knew Robinson.
 
                                                            -22-
 
considerable information about her mental health history, deprived the defense of material avenues of attack on Annas’ credibility and on the reliability of her identification.[23]
            The information available to the police about Johnson and his associates is even more compelling. As part of his misidentification defense, defendant brought out the fact that the Annunciation Road robbery occurred three and a half to four hours before Robinson was killed and that the police officers reported that Robinson may have been the person who committed the robbery. But the defense was barred from introducing evidence that the murder weapon had previously been owned by Grady, had been stolen by his son, Johnson, and that Johnson admitted to having possession of the weapon in late February. The absence of evidence of any link between Johnson and any of his associates, on the one hand, and defendant on the other hand, gave this evidence resonance.
 
--------------------------------------------
 
            [23]      In its initial response to the motion for new trial, the Commonwealth wrote with respect to the information about Annas’ psychiatric hospitalization: “[I]f . . . a key witness is being held in a psychiatric treatment facility at the time of trial, that fact must be disclosed to the defense to enable the defense to take appropriate steps to investigate any mental health or psychiatric issues that may bear upon the witness’s credibility or reliability. In the instant case, the fact that one of the two eyewitnesses (Annas), and certainly the key eyewitness, was being held after a suicide attempt in a secure treatment facility at the time of her trial testimony, does not appear to have been known to the defense. That poses significant concerns . . . [E]vidence related to [Annas’] significant, lengthy, and complex history of mental health and substance use issues would have very likely provided the defendant with information that might have been used to cast doubt upon the reliability of her identification through expert testimony or otherwise. . . . [T]he Commonwealth acknowledges that this information would have aided Pina in preparing his defense (which was based on mis-identification), including his possible utilization of experts in the area of psychiatric diagnoses, the effects of a significant and lengthy history of substance use and suicide attempts on an individual’s ability to perceive and/or recall events, and the effects of certain psychiatric medications on memory and/or perception. At the very least, this information may have been used by the defendant to attempt to cast doubt on whether a jury could find Annas credible, reliable, or biased.” Commonwealth’s Response to the Defendant’s Motion for a New Trial (“Com. Resp.”) at 23-24 (Docket #197).
 
                                                            -23-
 
            At the time of trial, the defense had no evidence linking Johnson to the Annunciation Road robbery. The police, however, did, but it was not disclosed to defendant. Although the prosecutor was following the Johnson case, on the evidence before me, I cannot find that the prosecutor or the police officers on the prosecution team had the information at issue here. Accordingly, I analyze it as newly discovered.
            The newly discovered evidence about Johnson indicates that on March 12, 1993, Johnson was arrested in the maroon Stolen Nissan, which had been stolen by men with a gun on the night of Robinson’s murder. It also indicates that, at the time of his arrest, Johnson had a scar over his right eye which had not yet fully healed, which was consistent with the injury the police observed two weeks earlier to one of the victims of the Annunciation Road robbery.24 In addition, at the time of his arrest, Johnson was in the presence of Woods, who physically matched the description of Robinson’s shooter. These facts, coupled with the fact that Johnson had stolen and possessed the murder weapon, suggested a link between Johnson, the Annunciation Road robbery, and the shooting of Robinson. This inferential link was strengthened by the trial testimony itself: (I) that the police reported that the victim of the shooting (Robinson) may have been, or may have been confused for (indeed, the police at least initially confused him for), the Annunciation Road robber; and (ii) the victims of the
 
--------------------------------------------
 
            [24]      The Commonwealth correctly points to certain discrepancies in this evidence. For example, it indicates that the owner of the Stolen Nissan reported that he had last seen the vehicle at 9:30 p.m. or 10 p.m. (depending on which document is consulted) on February 26, 1993, not before Robinson was shot. Given when, how, and by whom the car theft was reported, there are reasons to believe that the precise time that the Nissan was stolen is in question. The Commonwealth also points out that Offs. O’Loughlin and Moschella testified that the Annunciation Road robbery victim who was bleeding was tall and thin, but that Johnson was 5’9” and thin. These slight disparities would not materially undermine the probative weight of the inference that Johnson, who had possessed the murder weapon, had also been a victim of the Annunciation Road robbery. Estimates of height and weight are just that – estimates.
 
                                                            -24-
 
Annunciation Road robbery refused to cooperate with the police and one said “I’ll take care of it myself.” As the Commonwealth initially indicated, “it defies logic that these are mere coincidences.”[25] Com. Resp. at 26.
            This information is newly discovered and, even alone, casts doubt on the justice of defendant’s conviction. Such information would have likely caused the court to admit the evidence about Johnson having possessed the murder weapon in late February. It would have supplied missing links between Johnson, the Annunciation Road robbery, and Robinson’s shooting. It would have supplied defendant with meaningful Bowden and third-party culprit defenses. And it would have been a real factor in the jury’s deliberations.
            B.  DNA Evidence
            The evidence essentially that defendant’s DNA was not on the weapon that the shooter handled or on the areas of Robinson’s coat that the shooter grabbed is newly discovered.[26]  It was
--------------------------------------------
 
            [25]      In responding to defendant’s new trial motion, the Commonwealth initially wrote: “The murder weapon in this case is directly linked to Johnson. Johnson admits that he stole the gun from his father two months prior to the Keith Robinson murder. Two weeks after the murder, Johnson was arrested in a maroon car (that was stolen on the night of the murder) that arguably matches the description of the maroon car used in the murder, and he is definitively tied to the murder weapon. This is beyond troubling. In fact, it defies logic that these are mere coincidences. The evidence of the stolen motor vehicle, the same color as the vehicle the murderer exited, if disclosed, may have bolstered Pina’s third-party culprit theory or Bowden defense sufficiently to have made a difference to the judge in his analysis of Pina’s attempt to introduce evidence regarding the solid links between the stolen gun, Johnson, and the murder.” Com. Resp. at 26. The Commonwealth concluded with respect to the third-party culprit evidence: “On the record alone, this Administration will not support an argument that withholding police reports regarding a man tied directly to the murder weapon that killed Keith Robinson, who – two weeks after the murder – happened to be driving around in a maroon car that was stolen the same night Keith Robinson was murdered: 1) did not impact the defendant’s ability to receive a fair trial; 2) may not have been a real factor in the jury’s deliberations; and/or 3) would not have made a difference in the judge’s analysis of the admissibility of potential third-party culprit or Bowden evidence that the defense attempted, unsuccessfully, to introduce at trial.” I d. at 29.
 
                                                            -25-
 
only discoverable with the aid of scientific techniques and data analysis tools developed long after defendant’s trial and after his second motion for a new trial.
            This evidence alone, however, would not be sufficient to justify a new trial. The DNA test results demonstrate only an absence of evidence. They do not prove or even support a strong inference that defendant did not handle or fire the murder weapon, or that he did not handle or grab Robinson by the lapel. There is no evidence offered to quantify the likelihood that, if Robinson touched either item, his DNA would have been transferred to, and would have been detected on, the particular item. Nor is there any evidence to assess when DNA from any contributor other than Robinson came in contact with his jacket.
            The new DNA results only fortify the absence of proof. At trial, there was no testimony about any forensic evidence linking defendant to the murder weapon or to Robinson’s jacket. The newly discovered DNA test results more sensitively underscore the absence of a forensic link. Because these test results reflect the absence of evidence, not the failure of defendant to have touched the particular items, they do not materially undermine the key evidence the Commonwealth introduced; i.e., the eyewitness identifications.
            Of course, the absence of a forensic link because no testing was done has a slightly less persuasive impact from a defense perspective than the absence of a forensic link when an extremely sensitive evidence detection was performed. As such, while the inference that defendant did not touch the murder weapon or Robinson’s jacket is far from conclusive, when taken together with the other evidence discussed herein, it marginally further supports the conclusion that justice may not have been done. At a new trial, the new DNA test results would
 
--------------------------------------------
 
            [26]      Here I use a colloquial shorthand to describe the reasonable inference that could be drawn from the recent DNA testing results. The precise reported language of the findings from the TrueAllele software appears supra at 16 nn. 19, 20.
 
                                                            -26-
 
be admissible, and they would support the argument that no stone was left unturned to see if there was any evidence that defendant touched either item. If no further scientific testing is done on the items (or if no DNA comparison is made to any other potential suspects), it would also allow defendant to make a persuasive Bowden argument in light of the existence of third-party culprit evidence.
            C. Expert Eyewitness Identification Evidence
            The proferred, allegedly new eyewitness identification expert testimony is more problematic. In Commonwealth v. Gaines, 494 Mass. 525 (2024), the SJC recognized that expert eyewitness identification testimony may be newly discovered evidence, where the study of the factors affecting the reliability of eyewitness identifications did not exist at the time of trial. In Gaines, defendant’s trial occurred in June 1976, and prior motions for a new trial were denied in 1977, 1995, and 2014.[27] Gaines, 494 Mass. at 530-531, 538-541. In contrast to Gaines, this case presents the question of whether expert eyewitness identification testimony may be considered newly discovered, if the trial occurred at a point along the continuum of research development and before Gomes was decided and applied prospectively only.
            In most instances, “[t]he decision to call, or not to call, an expert witness fits squarely within the realm of strategic or tactical decisions.” Commonwealth v. Kirkland, 491 Mass. 339, 349 (2023), quoting Commonwealth v. Ayala, 481 Mass. 46, 63 (2018). In this context, I credit defendant’s trial counsel Bruce Carroll’s testimony that he decided not to call an eyewitness identification expert at trial because he “thought there were other ways to attack [the eyewitness
 
--------------------------------------------
 
            [27]      In Gaines, the SJC only looked to the state of the science at the time of trial. It did not address whether the issue of expert eyewitness identification testimony could have been presented, or would have been considered newly discovered, when the earlier new trial motions were addressed in 1995 or 2014.
 
                                                            -27-
 
identifications] without putting a professional on the stand. Other ways to present it.” This was clearly a tactical decision, but based only on the science of eyewitness identification as it existed at the time.
            In January 1996, at the time of trial, Gomes, of course, had not yet been decided and the field of eyewitness identification, while it had been around for almost 20 years, had not matured or experienced the kind of robust growth that it has seen in the 19 years after defendant’s trial and before Gomes. For example, of the approximately 93 social science reports, studies, and publications cited either in Gomes or in the Supreme Judicial Court Study Group on Eyewitness Evidence: Report and Recommendations to the Justices (July 25, 2013) (“Study Group Report”), available at https://www.mass.gov/files/documents/2016/08/ql/eyewitness-evidence-report- 2013.pdf (last viewed Jan. 31, 2025), upon which the SJC relied in Gomes, only 18 predated the trial in this case; the balance (approximately 81%) were published after defendant was tried and convicted.
            Similarly, in Kirkland, the SJC recently found that trial counsel was not ineffective by failing to call an eyewitness identification expert in a case tried in June 2013, almost two years after the SJC convened its eyewitness identification study group,[28] and only a year and a half before it issued its decision in Gomes. In its discussion, the SJC suggested in Kirkland that counsel was not ineffective to omit such an expert at trial because the field had not yet matured. The SJC wrote:
[A]t the time of trial [in 2013], expert evidence on eyewitness identification was still being developed and was not commonly introduced at trial; defense counsel did not have the benefit of our opinion in [Gomes], which recognized evolving research on
 
--------------------------------------------
 
            [28]      See Study Group Report at 1 (“in the fall of 2011, the Justices of the [SJC] convened the Study Group”).
 
                                                            -28-
 
eyewitness testimony and incorporated it into our jurisprudence, albeit prospectively . . . We, therefore, discern no error by trial counsel in failing to include the expert evidence proposed at the motion for a new trial.
I d. But see Commonwealth v. Santoli, 424 Mass. 837, 841-845 (1997); Commonwealth v. Hyatt, 419 Mass. 815, 818 (1995); and Commonwealth v. Francis, 390 Mass. 89, 98-101 (1983), each addressing a trial court’s discretion to admit expert testimony on the capacity of eyewitnesses to make identifications.
            The question of whether a defense lawyer’s conduct fell measurably below that which might be expected from an ordinary fallible lawyer is very different question from whether a particular piece of evidence is newly discovered. Yet the SJC’s apparent discussion in Kirkland of the first prong of the Saferian test, seems to suggest that even as late as 2013 expert evidence on eyewitness identification was still developing and not commonly used. Nonetheless, it is also clear to me that as early as 1996, when Mr. Carroll was representing defendant at trial, he was aware of the availability of eyewitness identification expert testimony on at least some subjects and, for tactical reasons, he chose not to call such an expert. I need not try to chart the precise contours of what expert testimony was available to Mr. Carroll in 1996, nor could I do so on the existing record.
            What is clear here is that the study of the impact of various mental health disorders, including polysubstance use disorder and borderline personality disorder, on the reliability of eyewitness identifications is new; and it is relevant here given the new information about Annas’ various mental health diagnoses. The availability of this expert testimony adds further weight to my conclusion that justice may not have been done in this case.
 
                                                            -29-
 
ORDER
            Defendant’s Motion for New Trial Pursuant to Rule 30(b) (Third) (Docket #105) is ALLOWED and his conviction is VACATED. The court will conduct a status conference in this case at 11:30 a.m. on February 24, 2025, in Courtroom 815.
/s/Peter B. Krupp
Justice of the Superior Court
February 3, 2025