APPEALS COURT 
 
 COMMONWEALTH vs. JONAS FRANCISQUE

 
 Docket:
 24-P-148
 
 
 Dates:
 December 18, 2024 – April 18, 2025
 
 
 Present:
 Blake, Vuono, Meade, Neyman, & Wood, JJ.
 
 
 County:
 Plymouth
 

 
 Keywords:
 Homicide. Evidence, Disclosure of evidence, Exculpatory, Third-party culprit, Police report. Practice, Criminal, New trial, Disclosure of evidence, Assistance of counsel. Due Process of Law, Disclosure of evidence. Constitutional Law, Assistance of counsel.
 
 

      Indictment found and returned in the Superior Court Department on October 1, 2004. 
     A motion for a new trial, filed on November 2, 2020, was heard by William F. Sullivan, J., and a second motion for a new trial, filed on November 10, 2022, also was heard by him.
     Donald A. Harwood for the defendant.
     Arne Hantson, Assistant District Attorney, for the Commonwealth.
     WOOD, J.  On May 7, 2004, Marckenzie St. Juste was stabbed in the heart and killed during a chaotic melee in the parking lot behind Roman's Bar in Brockton.  In 2008, the defendant, Jonas Francisque, was convicted by a jury in the Superior Court of one count of murder in the second degree and one count of intimidation of a witness.  A panel of this court affirmed the convictions in an unpublished memorandum and order.  See Commonwealth v. Francisque, 84 Mass. App. Ct. 1127 (2013).
     In 2020, postconviction testing generated new deoxyribonucleic acid (DNA) evidence.  Based on this new evidence, the defendant filed a motion for a new trial (first new trial motion), claiming that trial counsel was ineffective in failing to obtain DNA testing of various items.  A Superior Court judge who was not the trial judge (motion judge) denied it.  The defendant then filed public records requests, which revealed exculpatory evidence that the Commonwealth had failed to disclose.  The defendant then filed a second motion for a new trial (second new trial motion)[1] claiming that the Commonwealth had withheld exculpatory evidence, prejudicing the defense.  After holding an evidentiary hearing, the motion judge denied the second new trial motion as well.  The defendant filed timely notices of appeal after both decisions, and we consolidated them.  We affirm.
     1.  Background.  a.  Evidence at trial.  The evidence at trial covered three distinct periods.  The first was an altercation inside Roman's Bar shortly before the murder, where the victim was stabbed in the chin.  The second was a melee in the parking lot behind the bar immediately afterwards, where the victim was stabbed in the heart and killed.  The third was a series of events after the murder.
     i.  The altercation inside Roman's Bar.  At approximately 9:15 P.M. on May 7, 2004, following a fashion show at Massasoit Community College, the victim and his friend Patrick Garraud attended an after-party at Roman's Bar.  The victim began dancing with Melissa Sterlin, "for like a minute," when Sterlin's boyfriend, Melizaire Dorisca, confronted the victim angrily.  Josener Dorisca, Melizaire's brother,[2] knocked the victim to the ground.  Fernando Moise, a friend of the defendant, who arrived and left with him, testified that several other people, including Harry Wegens Cagne[3] and the defendant, joined in the attack.  At some point, the victim was stabbed in the chin and bled on the dance floor.
     The bar owner, Louis Asack, intervened, helped the victim up, and ordered everyone to leave the bar.  Asack instructed the victim and two of his friends to remain in the bar for a few minutes to avoid further conflict outside.
     ii.  The melee in the parking lot behind Roman's Bar.  After several minutes, Asack walked out the front door and around to the parking lot behind the bar, where he found a group of about fifteen to twenty people gathered in a circle talking with "[a]gitated excite[ment]."  When Asack approached the group, he noticed a large "black gentleman with a large Afro, wearing a black tee shirt,"[4] standing in the back of the group, holding a jackknife with a three- to four-inch blade in his right hand.  Asack asked the group to leave.
     At the same time, the victim left the bar through a back door and walked directly into the parking lot.  Moise testified that "the same people" who had attacked the victim in the bar immediately attacked him again.  Moise told police that six people -- including the defendant, Melizaire, and Cagne -- were involved in this attack.  Johanna Raymond testified that Melizaire screamed at the victim, "I'm going to get you[!]"  Moise testified that the defendant stabbed the victim in the chest, causing him to fall to the ground, and the other assailants then began kicking and punching him.[5]
     Meanwhile, Asack heard a scream that sounded like people fighting.  He looked in the direction of the scream and saw four men beating another man.  The group with Asack moved in the direction of the attack.  Asack hesitated for a moment, keeping his gaze on the large man with the Afro, holding a knife, who did not move.[6]  Asack then followed the crowd.  He saw the four men punching and kicking the victim, and the larger group starting to form around them and join in the attack.
     Asack attempted to disperse the crowd by shouting to one of his employees to "get my gun."  Several people got into cars and departed.  An ambulance took the victim to the hospital, where he was pronounced dead.  The victim had suffered three stab wounds to his torso.  One of those stab wounds, to the heart, was fatal.[7]
     iii.  Events after the killing.  Moise testified that after the attack in the parking lot, the defendant ran to his own car, they both got in, and they drove to the defendant's brother's house.  Moise saw blood on the defendant's shirt.  At his brother's house, the defendant took off his bloody shirt.  Moise further testified that the defendant had a bloody knife and that he had been cut on his hand.  Moise testified that he then asked, "You stab him?" and the defendant responded, "I did what I had to do."
     Several other people who were in the parking lot during the attack immediately went to a nearby bar, Vulcan.  One of them, Raymond, testified that she saw Melizaire outside the bathroom of the bar.  The bottom of his shirt and both of his hands were covered with blood.
     The day after the victim was killed, Raymond, who was the mother of the defendant's child, spoke to the defendant at his brother's house.  She testified the defendant showed her a bag of bloody clothes and told her he was going to New York to get rid of them.  Raymond stated that the defendant visited her several days later and had shaved off his braids.  The defendant then asked her, "If I kill anybody, would you get mad?" followed by, "What if I killed him because I don't like him?"[8]
     b.  Evidence discovered after trial.  i.  New DNA evidence.  After the defendant's convictions were affirmed on appeal, a Superior Court judge granted the defendant's motion for funds for DNA testing of the victim's clothing and the clothing of other persons present at the stabbing, including Cagne.  An independent forensic laboratory conducted the testing, which revealed, among other things, that (a) the victim's blood was found on the exterior rear lower leg of Cagne's blue jeans; and (b) the defendant was excluded as a source of scrapings taken from the victim's fingernails.
     ii.  Brockton police reports.  After obtaining DNA testing, the defendant filed a public records request.  In response, he received Brockton police reports (newly discovered police reports) that had never previously been provided to him or his counsel.  Those newly discovered police reports consisted of (1) a seven-page report by Officer Jason Sullivan dated May 8, 2004, (2) a one-page report by Officer Derek Salamone, signed on May 8, 2004, and (3) a three-page summary report by their supervisor, Captain Steve Loud.  The newly discovered police reports contained new information that five of the people involved in the altercation had driven away from the scene of the killing in a black Nissan Maxima.
     After an evidentiary hearing on the second new trial motion, at which police officers including State Police Major Leonard Coppenrath testified, the motion judge found that Coppenrath had reviewed the Brockton police reports prior to trial, that he did not notify the district attorney's office about them, and that the reports contained exculpatory information that had not been disclosed prior to trial.
     iii.  Letter from Raymond to defendant.  In advance of the evidentiary hearing on his second new trial motion, defense counsel subpoenaed all case files concerning the investigation from both the Brockton police department and the State police.  Pursuant to those subpoenas, defense counsel received a letter from Raymond (Raymond letter) addressed to the defendant in the jail where he was detained.  The Raymond letter suggested that Eddison Cesar, Melizaire, and Josener were blaming the defendant for the victim's murder, but that Cesar was lying and "playing the games good."  At the evidentiary hearing, Coppenrath testified that he "may have" seen the Raymond letter before and that he "may have" instructed the jail to monitor the defendant's mail as part of the investigation.
     The motion judge found that Coppenrath "saw that letter after it was opened at the Plymouth County House of Correction," it was exculpatory, and the Commonwealth did not disclose it to the defense prior to trial.  He concluded, however, that "[w]hile the withholding of and failure to disclose [the] Raymond[] letter is disturbing, the [Raymond] letter itself has limited exculpatory value."
     iv.  Coppenrath's testimony that the man Asack saw holding a knife matched Cagne's appearance.  Finally, at the evidentiary hearing on the second new trial motion, Coppenrath testified that Asack's description of the large Black man with an Afro, holding a jackknife in the parking lot, matched Cagne's appearance.[9]
     2.  Discussion.  a.  Standard of review.  "As a general matter, we review a judge's denial of a defendant's motion for a new trial to determine whether there has been a significant error of law or other abuse of discretion."  Commonwealth v. Caldwell, 487 Mass. 370, 374 (2021).  "Where, as here, the motion judge was not the trial judge, we accept findings made by the judge based on testimony at the evidentiary hearing, and we do not disturb them unless they clearly are erroneous."  Id. "However, we review independently findings made by the motion judge based entirely on documentary evidence."  Id.  "Further, we make an independent determination as to the correctness of the judge's application of constitutional principles to the facts as found" (quotations and citation omitted).  Id.
     b.  The Commonwealth's constitutional obligation to disclose exculpatory evidence.  "In criminal prosecutions, the government constitutionally is obligated to disclose material exculpatory evidence, even if it is not requested by the defendant."  Caldwell, 487 Mass. at 374.  Where the government fails to comply with this duty, a defendant may be entitled to a new trial.  "To obtain a new trial on the basis of nondisclosed exculpatory evidence, a defendant must establish (1) that 'the evidence [was] in the possession, custody, or control of the prosecutor or a person subject to the prosecutor's control'; (2) 'that the evidence is exculpatory'; and (3) 'prejudice.'"  Commonwealth v. Sullivan, 478 Mass. 369, 380 (2017), quoting Commonwealth v. Murray, 461 Mass. 10, 19, 21 (2011).
     Assuming the evidence is exculpatory and was subject to automatic discovery under Mass. R. Crim. P. 14 (a) (1) (A) (vii), as amended, 444 Mass. 1501 (2005), or was requested specifically, "a defendant need only demonstrate that a substantial basis exists for claiming prejudice from the nondisclosure."  Commonwealth v. Tucceri, 412 Mass. 401, 412 (1992).  See Commonwealth v. Rodriguez-Nieves, 487 Mass. 171, 179 n.12 (2021).
     c.  The newly discovered police reports and the Raymond letter.  The defendant first argues that the failure to disclose the newly discovered police reports and the Raymond letter to the defendant prejudiced him.  Defense counsel had made a specific request for this evidence.  Accordingly, the defendant is entitled to a new trial if he can establish a "substantial basis exists for claiming prejudice from the nondisclosure."  Tucceri, 412 Mass. at 413.  The motion judge found that the Commonwealth's failure to disclose the newly discovered police reports and the Raymond letter did not satisfy this standard.  We agree.
     First, there was not a substantial basis to claim prejudice from the Commonwealth's failure to disclose the newly discovered police reports because the fact that five of the people present at the stabbing fled in a black car did not detract from the evidence that established that the defendant, who fled in a white car, had stabbed and killed the victim.  There was no dispute that the victim was attacked by ten to fifteen people and "only that some of the men involved in the melee [fled in a black vehicle], not that the murderer did so."
     Second, there was not a substantial basis to claim prejudice from the failure to disclose the Raymond letter to the defendant.  We agree with the motion judge that
"it does not contradict [Raymond's] trial testimony that the day after the melee, [the defendant] claimed to have lost the knife he always carried, stated that he had to leave and go to New York to get rid of a bag of the bloody clothes he was wearing the night before, and instructed her not to speak to police."
 
     More importantly, at trial, defense counsel had already elicited the information contained in the Raymond letter.  Raymond admitted on cross-examination that she had initially told police that Cesar and Melizaire attacked the victim in the parking lot, and that the defendant was not involved in the stabbing.[10]  Because the information in the Raymond letter was merely cumulative of evidence that the jury had heard, there was not a substantial basis to claim prejudice from the failure to disclose it.
     d.  Coppenrath's testimony that the man Asack saw holding a knife matched Cagne's appearance.  Finally, the defendant contends that reversal is warranted because of a confluence of factors:  (a) defense counsel's ineffective assistance in failing to develop and present evidence that the victim's blood was on Cagne's pants, and (b) evidence that Asack's description of the man holding a knife matched Cagne's appearance.  See Commonwealth v. Rosario, 477 Mass. 69, 77-78 (2017) ("in rare cases, in order to fulfill the obligation incorporated in Mass. R. Crim. P. 30 [b]," as appearing in 435 Mass. 1501 [2001], "to determine whether 'justice may not have been done,' a trial judge may need . . . to consider how a number of factors act in concert to cause a substantial risk of a miscarriage of justice").  Again, we disagree.
     In his first new trial motion, the defendant asserted that trial counsel's failure to discover that the victim's blood was on Cagne's pants amounted to ineffective assistance.  The motion judge denied the motion, ruling that the defendant had not met his burden because he had not established that he had been deprived of "an otherwise available, substantial ground of defence."  Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  The motion judge noted that the blood was located "on the exterior rear lower left leg of [Cagne's] blue jeans."  The motion judge also noted that "[t]here was testimony that [Cagne] was involved in both the initial dance floor confrontation and the parking lot melee."  He noted the testimony that the victim was stabbed in the bar and again in the parking lot, meaning there was blood in both locations.  Based on these facts, the judge concluded that "evidence that . . . [Cagne], who [was] implicated in kicking and punching [the victim], had drops of blood on [his] clothing after the melee would not have influenced the verdict where there was no other evidence to suggest that [he] wielded a weapon such as a knife" (emphasis added).  Although the motion judge had no way of knowing it at the time he denied the first new trial motion, this final assertion was inaccurate.
     At the evidentiary hearing on the defendant's second new trial motion, Coppenrath testified that the man whom Asack described as the large Black man with an Afro, holding a knife with a three- to four-inch blade in the parking lot, matched Cagne's appearance.  See note 9, supra.  This was exculpatory because Moise testified that Cagne participated in the fatal attack, Cagne had the victim's blood on his pants, and the victim was killed by a four-inch stab wound to the heart.[11]
     Adopting the defendant's analytical framework, the motion judge concluded that the confluence of these factors did not create a substantial risk of a miscarriage of justice because "Asack testified that the man now identified as [Cagne] never walked over to the area of the melee involving [the victim]" (emphasis added).  The defendant argues that the motion judge did not address Moise's testimony that Cagne had participated in the fatal attack and the fact that the victim's blood was found on Cagne's pants.  This evidence tended to support a theory that Cagne participated in the fatal attack.  More narrowly, the combination of the evidence that Cagne was holding a knife in the parking lot and that the victim's blood was on Cagne's pants impeached Moise's testimony that the defendant fatally stabbed the victim.
     The motion judge characterized Moise as a "powerful" witness for the Commonwealth,[12] but his credibility was subject to question.  There was at least a plausible basis to find, as defense counsel argued, that he falsely accused the defendant of stabbing the victim.[13]
     After a careful review of this evidence in light of the trial record, we conclude that the defendant was not deprived of the effective assistance of counsel and, alternatively, the confluence of factors identified above did not create a substantial risk of a miscarriage of justice.
     At trial, defense counsel presented a very clear theory of defense:  Melizaire Dorisca was the killer.  In closing argument, he marshalled the evidence against Melizaire and repeatedly hammered home his theory.  Specifically, he noted:  (a) Melizaire had the strongest motive to kill the victim because the entire altercation began when the victim danced with Melizaire's girlfriend, Melissa Sterlin; (b) according to Asack, Melizaire initiated the altercation by pushing the victim to the ground in the bar; and (c) according to Raymond, Melizaire's shirt and both hands were covered in blood immediately after the attack.  Defense counsel also elicited testimony from Raymond that Melizaire initiated the fatal attack in the parking lot, screaming at the victim, "I'm going to get you[!]"  The only evidence that undermined this theory was Moise's testimony that the defendant killed the victim.
     By contrast, the evidence against Cagne was much weaker.  Specifically, (a) Moise testified that Cagne participated in the initial attack on the victim in the bar; (b) Moise testified that Cagne participated in the fatal parking lot attack; and (c) there was evidence that Cagne was holding a knife consistent with the murder weapon.  But this evidence was undermined by Asack's exculpatory testimony that the man who matched Cagne's appearance never approached the fatal attack.
     Considering all this evidence, we conclude that defense counsel made a reasonable tactical decision to focus on Melizaire as the most viable third-party culprit.  See Commonwealth v. Azar, 435 Mass. 675, 687 (2002) (in determining whether trial counsel's failure to act was unreasonable, court must consider whether it was reasonable tactical decision).
     We think that there is no reasonable possibility that counsel would have revised his theory if he had learned that the victim's blood was found on Cagne's pants, given that Melizaire presented a much stronger third-party culprit, and Asack testified that the man fitting Cagne's description never approached the fatal attack on the victim.  The fact that the victim's blood was on Cagne's clothing provided weak support for a theory that Cagne stabbed the victim.  As the motion judge noted in his denial of the first new trial motion, Cagne participated in the dance floor confrontation.  The victim's blood was located on the exterior rear lower left leg of Cagne's blue jeans.  The victim's fatal injury was a stab wound to the heart.  The fact that the victim's blood was on Cagne's lower rear pant leg is consistent with kicking the victim, not stabbing him in the heart.[14]  See Commonwealth v. Norris, 483 Mass. 681, 675-676 (2019) (defense counsel's decision to argue that Commonwealth's key witnesses, and not other "more attenuated" individuals, were real killers was reasonable tactical decision).
     Moreover, whether defense counsel was aware of the evidence that the man with the Afro holding the knife was Cagne, the confluence of this fact and counsel's failure to develop and present evidence that the victim's blood was found on the rear lower leg of Cagne's pants does not create a substantial risk of a miscarriage of justice.  First, had counsel presented Cagne as an alternative third-party culprit, he risked undermining his credibility with the jury.  Second, putting aside tactical considerations, a theory that Cagne was the real killer did not amount to a substantial defense.
     To acquit the defendant, the jury would have had to reject Asack's testimony that the man with the Afro never approached the group attacking the victim in the parking lot.  Moreover, the jury would have had to believe that Moise falsely accused the defendant of stabbing the victim and falsely claimed that the defendant confessed to stabbing the victim,[15] and yet, that he truthfully claimed that Cagne was involved in the fatal attack.
     For all of these reasons, we conclude that defense counsel did not provide ineffective assistance, and the confluence of factors does not create a substantial risk of a miscarriage of justice.
     The orders denying the motions for a new trial are affirmed.
So ordered.
footnotes

     [1] The defendant refers to this pleading as an amended motion for new trial.
     [2] Because the Dorisca brothers share a surname, we will refer to them by their first names for clarity.
     [3] Cagne's name is spelled variously in the record.  We adopt the spelling used by defense counsel at the evidentiary hearing on the defendant's second new trial motion.
     [4] Asack testified that this man was much taller than the defendant.
     [5] When he was interviewed by the police on May 11, 2004, Moise said that he saw Eddison Cesar stab the victim with a broken beer bottle.  He ultimately admitted that this was false and that he had merely seen Cesar make a stabbing motion.  He claimed that he made the false statement because he "was under pressure."
     In this same interview, Moise initially said that the defendant was not involved in the attack on the victim in the parking lot.  He eventually claimed that the defendant stabbed the victim.
     [6] When describing the location of the large man with the Afro who was holding a knife, Asack referred to a diagram to clarify that he was not near the people attacking the victim.
     [7] The medical examiner testified that the three stab wounds to the victim's chest were consistent with the stab wound to his chin and that all four injuries could have been inflicted with the same weapon.
     [8]Gregory St. Leger testified that after the melee, the defendant told him, "[W]hoever goes to talk to the cops . . . can get shot."  This was the factual basis for the witness intimidation conviction.  The defendant is not challenging that conviction here.
     [9] At trial Coppenrath testified that after interviewing Moise on May 11, 2004, "we spoke to Harry Wegens [Cagne]."  Therefore, the police knew prior to trial that the man whom Asack was describing matched Cagne's appearance.
     [10] As noted in note 5, supra, Moise also initially told police that Cesar stabbed the victim with a beer bottle, and that the defendant was not involved, but later recanted both statements.
     [11] It is unclear whether defense counsel was aware prior to trial that the "large Black man with an Afro holding a knife" fit Cagne's description.  His cross-examination of Asack at trial suggests that he was.  In any event, we adopt the defendant's requested prejudice standard:  whether the fact that defense counsel did not present this evidence to the jury created a substantial risk of a miscarriage of justice.  See Rosario, 477 Mass. at 80-81.
     [12] Moise did not testify at the evidentiary hearing on the second new trial motion, so we are in as good a position as the motion judge to evaluate his testimony.
     [13] First, when Moise was interviewed by the police, four days after the homicide, he denied that the defendant had participated in the assault on the victim in the bar.  Also, in that same interview, he initially accused Cesar of being the first to stab the victim.  Later in the interview, he recanted this accusation because, as he explained it, he felt pressure from the police.  While the medical examiner testified that the victim's stab wounds were consistent with a knife and not a broken beer bottle, the fact that Moise falsely accused Cesar supports an inference that he might have falsely accused the defendant as well.  Second, Moise admitted that when he testified before the grand jury, he claimed that the defendant never took his knife out of his pocket.
     [14] And again, defense counsel provided a much stronger third-party culprit defense at trial.  Despite this, the jury convicted the defendant.
     [15] Again, Moise testified at trial that he asked the defendant, "You stab him?" and the defendant responded, "I did what I had to do."  There was no evidence explaining why Moise would have falsely accused the defendant -- a friend -- of stabbing the victim and confessing to the crime.  Therefore, such a conclusion would have been based on speculation.  Although Moise falsely accused Cesar in his first police interview, he admitted this was a false accusation but maintained that his accusation of the defendant in that same interview was true.  Also, defense counsel developed this line of impeachment at trial.